LUMETRA, Plaintiff,

v.

UNITED STATES, Defendant,

and

Health Services Advisory Group, Inc., Intervening Defendant.

No. 08–663C.

United States Court of Federal Claims.

Filed Under Seal: Nov. 14, 2008.

Reissued: Nov. 19, 2008.

Alexander J. Brittin, The Brittin Law Group PLLC, Vienna, Virginia, for plaintiff. With him on the briefs and at the hearings,

were Constance A. Wilkinson, Epstein Becker Green PC, Washington, D.C., and Jonathan D. Shaffer and Mary Pat Gregory, Smith Pachter McWhorter PLC, Vienna, Virginia.

Anuj Vohra, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Gregory G. Katsas, Assistant Attorney General, Civil Division, Jeanne E. Davidson, Director, and Harold D. Lester, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. With him on the briefs and at the hearings was Jeffri Pierre, Attorney, Department of Health and Human Services, Washington, D.C.

John N. Hanson, Beveridge & Diamond, P.C., Washington, D.C., for intervening defendant.

## OPINION AND ORDER[1]

LETTOW, Judge.

This is a post-award bid protest. Lumetra challenges the award of a contract to perform work as the California Medicare Quality Improvement Organization ("QIO"). This contract was awarded to Health Services Advisory Group, Inc. ("HSAG") by the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS"). Lumetra, the incumbent contractor, contends that CMS improperly evaluated Lumetra's and HSAG's proposals with respect to the issues of past performance, personnel, governance, cost, and cost-realism, and further alleges that the prospec-

tive contractors were provided materially different access to agency information. *See* Compl. ¶ 3.

Lumetra has submitted a motion for judgment on the administrative record, seeking a preliminary and permanent injunction requiring CMS to terminate the contract with HSAG and award the contract to Lumetra. *See* Pl.'s Mem. in Support of Mot. for a Permanent Injunction and Judgment on the Administrative Record ("Pl.'s Mot."). In the alternative, Lumetra seeks an injunction requiring CMS to conduct a re-evaluation of the proposals and make a new best value determination, cost-technical tradeoff, and award decision. The United States has responded by submitting a cross-motion for judgment on the administrative record, contending that CMS properly evaluated Lumetra's and HSAG's proposals. *See* Def.'s Opp'n to Pl.'s Mot. for a Permanent Injunction and Judgment on the Administrative Record and Def.'s Cross–Motion for Judgment on the Administrative Record ("Def.'s Cross–Mot."). In addition, Lumetra has submitted a motion for supplementation of the administrative record, requesting the inclusion of seventeen additional documents. A hearing on the competing motions was held on October 16, 2008, and the motions accordingly are ready for disposition.

## FACTS[2]

### A. Statutory Scheme

Congress established the Medicare program in 1965 by enacting Title XVIII of the Social Security Act, thereby creating a federally funded program that provides health

---

[1]. Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(7) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before November 19, 2008. The parties advised that no redactions were necessary, and accordingly the opinion is being reissued without change.

[2]. The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement and the parties'

evidentiary submissions related to prejudice and equitable relief. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed.Cir.2005) (bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"); *Santiago v. United States*, 75 Fed.Cl. 649, 653 (2007) ("In accord with RCFC 52.1, the court 'is required to make factual findings ... from the [administrative] record as if it were conducting a trial on the record.'") (quoting *Acevedo v. United States*, 216 Fed.Appx. 977, 979 (Fed.Cir.2007)).

Other findings of fact and mixed findings of fact and conclusions of law are stated in the analysis which follows.

insurance to various eligible beneficiaries including the elderly and the disabled. *See* Health Insurance for the Aged Act, Pub.L. No. 89–97, § 102(a), 79 Stat. 286 (1965) (codified as amended in 42 U.S.C. §§ 1395–1396d and scattered sections of titles 26, 42, and 45 of the United States Code); *Telecare Corp. v. Leavitt,* 409 F.3d 1345, 1346 (Fed.Cir.2005). The Medicare program is administered by CMS, a unit within the Department of Health and Human Services. *See Wilson v. United States,* 405 F.3d 1002, 1005 (Fed.Cir.2005) (citation omitted).

To "promote the effective, efficient, and economical delivery of health care services," Congress amended Part B of Title XI of the Social Security Act by passing the Peer Review Improvement Act of 1982, Pub.L. No. 97–248, 96 Stat. 381, §§ 141, 142 (Sept. 3, 1982) (codified as amended at sections included within 42 U.S.C. §§ 1320c–1396b), which authorized the Medicare Utilization and Quality Control Peer Review Organization Program ("the QIO Program"). The statutory mission of a QIO is to "perform a wide variety of quality improvement interventions and provide technical assistance to providers to improve the quality of care furnished to Medicare beneficiaries." AR 90A–4916 (Statement of the Contracting Officer, Brian Hebbel).[3] The QIO Program requires CMS to enter into a contract with a private organization typically composed of licensed physicians whenever it seeks (1) to determine whether Medicare services are reasonable and necessary, (2) to promote "effective, efficient, and economical delivery of Medicare services," or (3) "to promot[e] the quality" of the services funded by Medicare. 42 U.S.C. § 1395y(g); *see Public Citizen, Inc. v. Dep't of Health & Human Servs.,* 151 F.Supp.2d 64, 67 (D.D.C.2001).

Overall, the QIO Program embraces 53 separate performance-based cost reimbursement contracts between CMS and QIOs—one for each state, territory, and the District of Columbia. *See* AR 90–A–4916 (Statement of the Contracting Officer); AR 111–5246 (CMS Justification Memorandum for Override of Automatic Stay Pending Protest of Lumetra, Government Accountability Office Protest, B–400456 (Sept. 5, 2008)). The term of a QIO is three years in length; each three-year term is guided by a Statement of Work ("SOW"). *See* AR 90A–4917 (Statement of the Contracting Officer). The contract may be renewed on a triennial basis, as long as the state QIO contractor satisfies various performance standards. 42 U.S.C. §§ 1320c–2(c)(2)–(3), (c)(7). If CMS makes a determination that a QIO has performed unsatisfactorily in a particular state, CMS may initiate a new competitive process to award a contract for QIO services in that state. 42 U.S.C. §§ 1320c–2(c)(4), (i)(2).

### B. Lumetra's Failure to Fulfill All Required Elements of its Prior Contract

For the first eight contracting cycles, from 1984 to 2008, Lumetra was the incumbent QIO contractor for the State of California. Pl.'s Mot. at 3. The ninth cycle and SOW was scheduled to begin in all states on August 1, 2008. AR 90A–4917 (Statement of the Contracting Officer). The ninth SOW differed from the eighth SOW insofar as it was explicitly structured around a variety of mandatory and optional "themes" relating to different quality improvement areas. *See id.* Three core themes under the new SOW dealt with Beneficiary Protection (Theme 6. 1), Patient Safety (Theme 6.2), and Prevention (Theme 6.3). AR 10B1817 (RFP No. CMS–2007–QIO9thSOW–NAHC Amended Sections L and M) ("RFP Sections L and M").

After evaluating Lumetra's performance under the eighth SOW, CMS notified Lumetra that it had failed to satisfy the standard of performance necessary to trigger automatic renewal for the ninth SOW contract for California. AR 11–2157 (Performance Evaluation 8th SOW (Oct. 20, 2007)).[4] CMS spe-

---

**3.** "AR ——" refers to the administrative record filed with this court on September 25, 2008, in accordance with RCFC 52.1(a). The administrative record has been subdivided into tabs. The first number in a citation to the administrative record refers to a particular tab, and the number

after the hyphen refers to the particular page number, *e.g.,* "AR 6–155."

The transcript of the hearing held on October 16, 2008 is cited as "Hr'g Tr. ——."

**4.** Lumetra was one of eight incumbent QIOs that CMS determined had failed to meet performance

cifically assigned Lumetra a rating of "Not Pass" on the performance objective of Physician Practice, labeled Task 1d1. *Id.;* Hr'g Tr. 77:13–17.[5] CMS also notified Lumetra that it would be opening the California QIO contract to re-competition. AR 11–2157 (Performance Evaluation 8th SOW).

Exercising the statutory right set forth in 42 U.S.C. § 1320c–2(c)(4),[6] Lumetra challenged CMS' evaluation of Task 1d1 and submitted additional data regarding its performance under the eighth SOW. AR 15–2229 (Lumetra Performance Evaluation Letter); Hr'g Tr. 80:15–17. A panel of CMS members re-assessed Lumetra's performance and recommended that CMS' initial finding of Lumetra's "Not Pass" rating on Task 1d1 be upheld. AR 15–2229 (Lumetra Performance Evaluation Letter). Dr. Barry M. Straube, the Chief Medical Officer for CMS, confirmed this result. *See id.* at AR 15–2230. Accordingly, CMS notified Lumetra of its "intention not to renew the subject contract non-competitively," *id.* at AR 15–2229, and Dr. Straube conveyed this outcome to the contracting officer. *Id.* at AR 15–2230.

### C. CMS' Solicitation and Award

CMS then issued Request for Proposal CMS–2007–QIO9thSOW–NAHC ("the RFP"), which re-opened the California QIO contract to competition for the ninth SOW. AR 90A–4918 (Statement of the Contracting Officer). In the RFP, CMS specified that it would evaluate offerors primarily based on the technical quality of their proposals, and would seek to make various tradeoffs to ensure that the contract would not auto-

matically be given to "the lowest priced/cost [o]fferor or . . . the highest technically rated offeror." AR 10B–1858 (RFP Sections L and M). CMS advised that the contract award would be given to "the [o]fferor whose proposal meets the terms and conditions of this solicitation and represents the overall 'Best Value' to the [g]overnment." *Id.* at AR 10B–1858. CMS set out four factors with respect to which it would analyze competing proposals: Technical Understanding and Approach (300 possible points), Project/Management Plan (150 possible points), Past Performance (150 possible points), and Personnel (90 possible points). *Id.* at 10B–1859.[7] The four subfactors under Technical Approach were Strategy, Major Activities, Approach to Impediments/Barriers/Challenges, and Documentation of Stakeholder Support. *Id.* In addition, an offeror could receive 35 "bonus points" if it met the requirements of a Physician Sponsored Organization under Section 1152(1)(A) of the Social Security Act, 42 U.S.C. § 1320c–1. *Id.* at 10B–1862.

Other aspects of CMS' assessment of the offerors' proposals were more subjective in nature. Pursuant to making what it called a " 'Best Value' award decision," CMS stated that it would perform both a cost evaluation and a cost realism analysis to determine if proposed costs were reasonable and realistic. AR 10B–1858 (RFP Sections L and M). These cost analyses would "not be numerically scored." *Id.* at AR 10B1862. Rather, by those analyses CMS sought to

> review and evaluat[e] specific elements of each Offeror's proposed cost estimate to

---

objectives under the eighth SOW. AR 15–2230 (Lumetra Performance Evaluation Letter (Jan. 17, 2008)); AR 90A–4918 (Statement of the Contracting Officer).

**5.** At the hearing, the government explained that the panel's finding as to Lumetra's Task 1d1 failure was not located in the administrative record: "The only thing that is in the record is the letter notifying Lumetra that this contract was going to be re-competed and a summary of the panel findings that was attached to it." Hr'g Tr. 78:15–18.

**6.** Section 1320c–2(c) provides in pertinent part:

(4) if the Secretary intends not to renew a contract, he shall notify the organization of his

decision at least 90 days prior to the expiration of the contract term, and shall provide the organization the opportunity to present data, interpretations of data, and other information pertinent to its performance under the contract, which shall be reviewed in a timely manner by the Secretary;

42 U.S.C. § 1320c–2(c)(4).

**7.** As defendant points out, CMS made a slight error in calculating the available point totals. *See* Def.'s Cross-Mot. at 6 n. 3. The Personnel factor contained two subfactors, Key Personnel and Staffing Plan, each worth 45 points. AR 10B–1859 (RFP Sections L and M). However, CMS stated that it was possible to obtain 100 points under this factor, thus overstating the total possible score by 10 points.

determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the Offeror's technical proposal.

*Id.* at AR 10B1865.

The RFP stated that past performance would be "subjectively evaluated" in accord with Subpart 42.15 of the Federal Acquisition Regulations ("FAR"), which defines past performance as

> relevant information, for future source selection purposes, regarding a contractor's actions under previously awarded contracts. It includes, for example, the contractor's record of conforming to contract requirements and to standards of good workmanship; the contractor's record of forecasting and controlling costs; the contractor's adherence to contract schedules, including administrative aspects of performance; the contractor's history of reasonableness and cooperative behavior and commitment to customer satisfaction; and, generally, the Offeror's business-like concern for the interest of the customer.

*Id.* at 10B1861 (citing 48 C.F.R. § 42.1501). CMS also sought to review each offeror's personnel to determine the "[d]egree to which each candidate is qualified for the position proposed and available to begin work" and "the degree to which the staffing plan demonstrates the offeror's ability to provide qualified personnel in sufficient numbers to perform the work under the contract." *Id.*

Lumetra and HSAG were among the three offerors to submit initial proposals for the ninth SOW QIO contract. AR 90A–4919 to 90A–4920 (Statement of the Contracting Officer). Information submitted by the offerors was evaluated by CMS through reports issued by the Technical Evaluation Panel ("TEP") and Financial Management Specialists ("FMS"), as well as summaries prepared regarding cost/price, corporate governance and conflicts, and information security system plans. *Id.* at AR 90A–4921. The con-

tracting officer, upon review of these reports and summaries, concluded that Lumetra and HSAG were both within the "competitive range" of the contract, and sought the submission of final proposals from those two offerors. *Id.* at AR 90A–4921 to 90A–4922.

In their final revised proposals, submitted on July 24, 2008, Lumetra decreased its proposed QIO contract costs from $46,795,194 to $46,632,082, and HSAG increased its costs from $30,178,129 to $31,102,514. AR 90A–4922 (Statement of the Contracting Officer). The TEP reviewed both proposals and assigned HSAG a mean technical score of 593.34, and Lumetra a score of 542.67. AR 72–4633 (HSAG Score Sheet); AR 74–4648 (Lumetra Score Sheet).[8] In its evaluation of the offerors' proposed costs, the FMS found that HSAG had underestimated the costs of direct labor, subcontractors/consultants, travel, and other direct costs, AR 70–4618 (Business Proposal Evaluation–HSAG), while Lumetra had underestimated direct labor costs and overestimated travel and other direct costs. AR 69–4605 (Business Proposal Evaluation–Lumetra). Despite these miscalculations, the FMS found only a slight difference between the two offerors' proposed and projected actual costs: Lumetra would have to spend an estimated $714,518 more than initially proposed, *see id.*, and HSAG would have to spend $881,953 more than initially proposed. *See* AR 70–4618 (Business Proposal Evaluation–HSAG).

Given HSAG's higher technical score, HSAG's lower estimated cost, and the two offerors' comparably realistic cost proposals, the lead for the FMS and the chairperson for the TEP recommended to the contracting officer that the ninth SOW contract for California be awarded to HSAG. 78–4666 (Memo to Naomi Haney–Ceresa from Annette Kussmaul and David Russo, Award Recommendation (July 28, 2008)). This final recommendation noted that "the HSAG proposal was of higher technical merit. It would not otherwise benefit the government to spend the additional $15 million that Lumetra proposes to accomplish the work of the 9th SOW QIO

---

**8.** Included in Lumetra's score was a 35 point bonus for "Physician Sponsored Organizations." AR 74–4648 (Lumetra Score Sheet). HSAG did not receive this bonus. AR 72–4633 (HSAG Score Sheet).

contract." *Id.* at 78–4665. It observed that HSAG's "[w]eaknesses were ... in the areas of Documentation of Stakeholder Support, and Key Personnel," whereas Lumetra had a "[p]articular weakness ... in the area of Past Performance." *Id.* These themes were reiterated in the final decision awarding the contract for the ninth SOW to HSAG, in which the contracting officer found that "HSAG's proposal significantly exceeded Lumetra's proposal in the area of the Project Management Plan and Past Performance." AR 81–4750 (Contracting Officer Award Decision, QIO Contract for the State of California (July 30, 2008)). HSAG was awarded the contract on July 30, 2008. *Id.* at 81–4751.

### D. Lumetra's Protest Before GAO; CMS' Override

Two weeks after the award decision, counsel for Lumetra lodged a formal protest with the Government Accountability Office ("GAO"), alleging that CMS "engaged in improper discussions with" HSAG; "disclosed source selection and nonpublic information to HSAG" and "failed to mitigate" the resulting organizational conflict of interest; "relied upon material misrepresentations" concerning HSAG's key personnel; "improperly evaluated [the] proposals" under the Technical and Past Performance factors; failed properly to credit Lumetra for its physician sponsorship; improperly evaluated HSAG's governance; "failed to conduct proper cost evaluation, cost realism, and risk analyses;" "misled Lumetra regarding" contract rates; and "improperly conducted the cost-technical tradeoff and best value determination." AR 87–4774 to 87–4775 (Protest of Lumetra, Government Accountability Office, B–400456 (Aug. 12, 2008)). On September 8, 2008, the Department of Health and Human Services notified GAO that it had overridden GAO's automatic stay of the protest on the ground that it would be "in the best interests of the government" to continue performance of the ninth SOW. AR 112–5260 (Letter from Douglas Kornreich to David Ashen, re: Notification of Competition in Contract Act Stay Override, Protest of Lumetra, B–400456 (Sept. 8, 2008)). This notification led Lume-

tra to withdraw its GAO protest on September 17, 2008, and to file its protest with this court. Compl. ¶ 15.

### E. Proceedings in this Court

On September 18, 2008, Lumetra filed an application for a temporary restraining order and a motion for a preliminary injunction with this court. The United States filed a response to the application and motion on September 19, 2008. An evidentiary hearing was held on September 22, 2008 to address the requests for temporary and preliminary equitable relief.[9] On October 1, 2008, this court denied Lumetra's application for a temporary restraining order, concluding that Lumetra's application lacked urgency because Lumetra would continue to hold a contract with CMS until October 31, 2008, at which time the newly awarded ninth SOW contract would fully come into force. *See* Order of Oct. 1, 2008, Docket No. 32. This court also deferred consideration of Lumetra's motion for a preliminary injunction until after completion of briefing on the administrative record. *See id.* Pursuant to RCFC 65(a)(2), this court consolidated the proceedings on the motion for preliminary injunction with the proceedings on the requested permanent injunctive relief. *See id.* In accord with RCFC 52.1, this court adopted an expedited schedule for filing cross-motions for judgment on the administrative record for the procurement, which record was filed on September 25, 2008. On October 2, 2008, Lumetra submitted a motion for supplementation of the administrative record, requesting the inclusion of seventeen additional documents. A day later, on October 3, 2008, the government filed supplemental additions to the record. The parties thereafter submitted their briefs on the merits, and a hearing was held on October 16, 2008, to address the cross-motions for judgment on the administrative record.

### STANDARDS FOR DECISION

In deciding a post-award bid protest, this court adheres to the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4)

---

9. Following the evidentiary hearing, HSAG was granted leave to participate in the case as an intervening defendant. Order of Sept. 24, 2008, Docket No. 24.

("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Under the APA, this court may set aside an agency decision such as a contract award if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Accordingly, the first task of this court is to determine whether the protestor has established either the lack of a rational basis or some other "violation of regulation or procedure" by the agency. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001). In reviewing the agency's evaluations, findings, and conclusions, the court "will not second guess the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir. 1996). Even if this court "might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations," *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed.Cir.1989), the agency's decision should be sustained so long as it evinces "rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir.2000). By contrast, an agency will be found to have acted arbitrarily and capriciously if it "entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Alabama Aircraft Indus., Inc. v. United States*, 83 Fed.Cl. 666, 680 (2008) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

For a protestor to obtain relief after it has demonstrated that the agency's actions were not supported by a rational basis or that the agency's procedures were not in accordance with the law, this court additionally requires the protestor to show that the agency's error "actually operated to prejudice the protestor in the procurement." *Alabama Aircraft*, 83 Fed.Cl. at 680 (citing *Bannum*, 404 F.3d at 1351).[10] To establish actual prejudice, the protestor must demonstrate that but for the agency's error, "there was a substantial chance it would have received the contract award." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996); *Alfa Laval Separation Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999).[11] If a protestor succeeds in establishing prejudicial error, the court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2); *see PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed.Cir.2004) (listing the factors that a trial court should consider in deciding whether a permanent injunction should be issued).

## ANALYSIS

### I. PAST PERFORMANCE

Upon completion of the initial past performance evaluation, HSAG was assigned a score of 146 out of 150 possible points. AR 31–3489 (HSAG, Technical Evaluation Panel Summary, California Competition, May–June 2008). Lumetra was assigned a score of 70 points. AR 32–3505 (Lumetra, Technical Evaluation Panel Summary, California Competition, May–June 2008). Because both offerors were deemed to be within the competitive range on an overall basis, each was

---

**10.** It is undisputed that Lumetra fell within the zone of consideration for the California QIO contract, *see* AR 90A–4921 (Statement of the Contracting Officer), but this finding suffices only to prove that Lumetra had *standing* to sue; it does not directly demonstrate that Lumetra suffered prejudice as a result of any alleged agency error. *See Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir. 2003); *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed.Cir.

2002); *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1575 (Fed.Cir.1983).

**11.** The inquiry into prejudicial error does not require a protestor to show that but for the agency's errors, the protestor "would have won the contract." *Bannum*, 404 F.3d at 1358 (declining to apply a test of "actual causation"). Rather, the protestor must merely demonstrate a "substantial chance" that it would have received the contract but for the errors. *Id.*

invited to submit a revised technical proposal. AR 90A–4922 (Statement of the Contracting Officer). After each of the two offerors provided a set of responses to CMS' concerns regarding their particular offer, HSAG's past performance score was reassessed with a final score of 146.67, AR 72–4633 (HSAG Score Sheet), and Lumetra was reassessed with a final score of 75.67. AR 74–4648 (Lumetra Score Sheet). This difference in past performance scores was the major dispositive factor in the evaluation of the two competitive offers.

Lumetra contends that CMS' evaluation of its past performance was "arbitrary and unreasonable" on interrelated grounds: (1) that CMS improperly relied upon an in-progress evaluation of past performance to evaluate Lumetra and ignored three other relevant performance questionnaires; (2) that the in-progress questionnaire was in conflict with other performance evaluations; (3) that CMS' contracting officer unreasonably prohibited the TEP from resolving various discrepancies in Lumetra's past performance reports; (4) that CMS relied on flawed metrics with respect to its evaluation of Subtask 1d1; (5) that CMS renewed QIO contracts in other states despite the fact that incumbent contractors in those states had also failed tasks similar to Subtask 1d1; and (6) that CMS failed to grant sufficient weight to a report by the individual who turned in the most contemporaneous evaluation of Lumetra's performance. Pl.'s Mot. at 12–14.

Lumetra's objections to CMS' past performance evaluation can be condensed to objections to the methodology, substance, and comparative weight of CMS' evaluation of Subtask 1d1 within the context of the overall past performance determination. The United States acknowledges that the TEP in effect "deci[ded] to afford substantial weight to ... Lumetra's most recent and relevant performance history," including its failed performance of Subtask 1d1. Def.'s Cross–Mot. at 14. The United States responds that

it was "neither arbitrary nor unreasonable" for CMS to have assigned significant negative weight to Lumetra's failure on "a specific subtask that was directly relevant to the 9th SOW QIO contract." *See id.* In rejoinder, Lumetra argues that CMS' failure to comply with the procedures set forth in FAR Subpart 42.15 indicates that it "was arbitrary and unreasonable for the agency to have relied upon any assessments of Lumetra's eighth SOW performance." Pl. Lumetra's Resp. to Def.'s Cross Mot. for Judgment on the Administrative Record and Reply to Def.'s Opp'n to Lumetra's Mot. for Judgment ("Pl.'s Reply") at 10. Lumetra contends that "[i]f the agency had fairly and properly evaluated Lumetra's past performance, Lumetra would have received a past performance score equal to or higher than HSAG's score. This would have result[ed] in a best value determination to award the 9th SOW contract to Lumetra." Pl.'s Mot. at 15.

*A. Evaluations Considered by CMS*

Pursuant to Section L of the RFP, each offeror was invited to "describe in detail the commercial and/or government contracts that it has performed in the past three years that demonstrate experience in completing requirements similar or related to this solicitation." AR 10B–1825 (RFP Sections L and M).[12] Lumetra offered eleven of its past contracts for CMS to consider during the past performance evaluation. *See* AR 23–2780 to 23–2791 (Lumetra, Technical Proposal, RFP (Apr. 18, 2008)). CMS then narrowed its inquiry to four specific past performance evaluations. *See* AR 37–3533 (Lumetra, Past Performance Questionnaire Responses). The first was a response to a questionnaire on Form J–19 by CMS of Lumetra's performance under the eighth SOW; that questionnaire response was compiled by Ms. Tina Dickerson. *Id.* at AR 37–3533 to 37–3538.[13] On the six categories for which a rating could be given, the CMS project officer assigned Lumetra a score of "good" on two categories, "excellent" on two

---

12. CMS was also entitled under Section L of the RFP to base its evaluation upon "past performance information from sources other than those included in the Offeror's proposal." AR 10B–1826 (RFP Sections L and M).

13. The responses to this questionnaire were prepared by Tina Dickerson, the representative of CMS who was responsible for technical direction of Lumetra on the QIO contract. *See* Pl.'s Mot. at 6.

categories, and "demonstrates exceptional performance" on two categories. *See id.* at AR 37–3534 to 37–3536. Within the category of "quality of products/services," for which Lumetra received a score of "good," the project officer added a note that Lumetra "failed the evaluation, and specifically the physician office task. For this task [Subtask 1d1], the QIO received a no pass, which sent them to the panel and then out for a competitive bid." *Id.* at AR 37–3535.

The second questionnaire response on Form J–19 was provided by the California Healthcare Foundation of Lumetra's work on a patient safety contract unrelated to QIO work. AR 37–3539 to 37–3543 (Lumetra Past Performance Questionnaire Responses). Lumetra received a rating of "excellent" on four categories and "exceptional" on two categories. *Id.* at AR 37–3540 to 37–3541. The third was a questionnaire response on Form J–19 by the Colorado Foundation for Medical Care of Lumetra's work of a subcontract unrelated to QIO work. *Id.* at AR 37–3544 to 37–3548. Again, Lumetra received "excellent" for four categories and "exceptional" for two categories. *Id.* at AR 37–3545 to 37–3546. The final evaluation, a Standard Contractor Performance Report ("NIH report"), constituted an "in-progress evaluation" of Lumetra's work under the eighth SOW. *Id.* at AR 37–3549 to 37–3552. On the NIH report, Lumetra was given a rating of "fair" on all four of the listed categories. *Id.* at AR 37–3549 to 37–3550.

CMS used the information from three questionnaire responses and the NIH in-progress report to analyze Lumetra's past record of "conforming to contract requirements," "forecasting and controlling costs," "adher[ing]" to "contract schedules," exhibiting "commitment to customer satisfaction," and other relevant aspects of contract performance. AR 10B–1861 (RFP Sections L and M) (quoting 48 C.F.R. § 42.1501). Lumetra's low scores on the past performance criterion were due in large part to its deficiency on Task 1d1. *See, e.g.,* AR 42A–3567 (Initial Individual Technical Evaluation Summary Form compiled by Eugene Freund).

## B. NIH's "In–Progress" Evaluation

### 1. Lumetra's conceded inability to comment on NIH's "in-progress" evaluation.

■ In its attack on CMS' evaluation of its past performance, Lumetra argues first that it "should have been given an opportunity to comment under FAR [§ ] 42.1503(b) on the [NIH] Report's 'fair' ratings." Pl.'s Mot. at 15. FAR § 42.1503(b) states in part that "[a]gency evaluations of contractor performance ... shall be provided to the contractor as soon as practicable after completion of the evaluation. Contractors shall be given a minimum of 30 days to submit comments, rebutting statements, or additional information."

48 C.F.R. § 42.1503(b). Lumetra avers that it "asked for an opportunity to submit comments under FAR § 42.1503, but was denied" that opportunity, and thus was unable to exercise its right to "submit comments, rebutting statements, or additional information" in accordance with the FAR. Pl.'s Mot. at 15. CMS' failure to provide such an opportunity, Lumetra argues, means that "the agency should not be permitted to rely upon the [NIH] Report (Tab 37 at 3549–52) when evaluating Lumetra's past performance." Pl.'s Mot. at 16.

The United States concedes that Lumetra "was not given an opportunity to respond to the NIH report." Def.'s Cross–Mot. at 24; *see also* Hr'g Tr. 80:1–3. The United States represents that CMS intended to send the NIH report to an employee of Lumetra, but due to an incorrect e-mail address in the NIH database, the report was never properly provided to Lumetra for review and comment. Hr'g Tr. at 80:3–11. Given these concessions, this court finds that the failure of CMS to provide Lumetra with the NIH report "as soon as practicable after completion of the evaluation" and to give Lumetra time to submit comments to that report contravenes FAR § 42.1503(b).

■ Lumetra contends that the questionnaire response on Form J–19 providing an informal evaluation of Lumetra's performance under the eighth SOW by Ms. Dickerson was also subject to FAR § 42.1503(b).

*See* Pl.'s Resp. at 11. However, that contention is without merit. An informal questionnaire does not serve the same function as a formal evaluation reposing in NIH's database. The purpose of FAR Subpart 42.15 is to "provide[ ] policies and establish[ ] responsibilities for recording and maintaining contractor performance information." 48 C.F.R. § 42.1500. FAR § 42.1503(b) is specifically addressed to "[a]gency evaluations of contractor performance." These evaluations are recorded in the NIH's "standard contracting database" such that they might serve as a contemporaneously generated reference and basis for future evaluations of the contractor's work in a variety of contexts, including use as an evaluation of past performance regarding competitions for other contractual work. *See* Hr'g Tr. 73:13–18.[14] In contrast, a questionnaire response submitted on form J–19 is prepared because the entity involved has become an offeror on another procurement and submits the prior work as a reference to the agency. *See* Hr'g Tr. 74:14–17; 125:10–16. A questionnaire response on Form J–19 is not an official evaluation and is not subject to the more robust procedural cross-checks provided by FAR § 42.1503(b).

Accordingly, the court finds that Lumetra's inability to comment on the questionnaire response provided by Ms. Dickerson for CMS on Form J–19 does not contravene the FAR, because an informal questionnaire is not subject to the procedural requirements of FAR § 42.1503(b). Contrary to Lumetra's contention that *both* the NIH's "in progress" evaluation and Ms. Dickerson's questionnaire response on form J–19 should be disregarded, *see* Pl.'s Resp. at 9, this court finds no violation of the FAR as to the questionnaire response, and deems the findings in that questionnaire to be relevant to the agency's past performance determination. That response, as well as other materials in the administrative record, reported Lumetra's failure to satisfy Task 1d1 of the eighth SOW, which failure was found to be "directly relevant to core-prevention work in [the QIO] contract." Hr'g Tr. 134:7–17 (citing AR 42A–3567 (Initial Individual Techni-

cal Evaluation Summary Form Compiled by Eugene Freund)).

Lumetra has, however, established that CMS violated the law by failing to permit Lumetra to respond formally to the NIH in-progress report. *See Bannum*, 404 F.3d at 1351 (finding that an agency's failure to comply with FAR § 42.1503(b) amounts to a "violation[ ] of law" under the APA, 5 U.S.C. § 706(2)(A)).

### 2. The government's claimed lack of prejudice.

#### a. Lumetra's failure to pass required elements of the eighth SOW.

■ The fact of Lumetra's failure on Task 1d1 is consistent across the administrative record, and CMS' negative finding as to Lumetra's performance under Task 1d1 is a fact that exists independently of NIH's in-progress report. As the government points out, it was the fact of the Task 1d1 failure itself—and not merely the numerical ratings that were assigned in the questionnaire response on Form J–19 and in the NIH in-progress evaluation—that served as the basis for CMS' determination of past performance. *See* Hr'g Tr. 82:14–22; Def.'s Cross–Mot. at 24 (arguing that Lumetra's lower past performance score was "not based upon the 'fair' ratings in the NIH Report, but [rather upon] Lumetra's failure [in] subtask 1d1 [of] the eighth SOW").

#### b. Lumetra's opportunity to address the factual conclusions underlying CMS' overall past performance evaluation.

FAR § 42.1503(b) requires that agencies "provide for review at a level above the contracting officer to consider disagreements between the parties regarding the evaluation [of contractor performance]." 48 C.F.R. § 42.1503(b). Lumetra cites this second provision of Section 42.1503(b) and argues that it was never given an opportunity by CMS to obtain higher-level review of the NIH report or of the conclusions as to Task 1d1 contained within that report. *See* Pl.'s Resp. at

---

14. The NIH report was labeled "in-progress" because it had not yet been reviewed or commented upon by Lumetra, which the United States avers is a necessary step pursuant to the labeling of such an evaluation as "final." *See* Hr'g Tr. 76:8–15.

8. The United States concedes the first aspect of this contention but contests the latter aspect, arguing that Lumetra was, in effect, given an opportunity to comment on and obtain adequate review of the facts underlying CMS' past performance evaluation. *See* Def.'s Cross–Mot. at 25–26.

Respecting review of the conclusions, the United States first argues that Lumetra was formally notified of its failure to achieve all required elements of the eighth SOW, and then invoked statutory and regulatory rights to review and challenged this failure before a panel of CMS project officers. The panel made a decision confirming the failure that was ultimately reviewed by Dr. Barry Straube, the chief medical officer of CMS. Def.'s Cross–Mot. at 26 (citing AR 15–2230 (Lumetra Performance Evaluation Letter)). As part of its challenge, Lumetra submitted contentions and documentation to CMS. After reviewing Lumetra's challenge and the panel's findings, Dr. Straube issued a recommendation to the contracting officer that Lumetra's contract "should not be renewed." AR 15–2230 (Lumetra Performance Evaluation Letter). Lumetra argues, however, that under *Bannum,* the review by Dr. Straube "does not satisfy the requirements of FAR [§ ] 42.1500" because Dr. Straube neither occupies a level in the chain of authority above the contracting officer nor has any authority to supervise the contracting officer. Hr'g Tr. 20:8–12; 22:6–12; *see also* Pl.'s Resp. at 9.[15] Lumetra additionally contends that even if Dr. Straube was in a position to offer meaningful review of Lumetra's comments, he failed to "give a subjective assessment of whether or not the contractor did a fair job, a good job, or an excellent job, or a plus-plus [exceptional] job. He just said, go or no-go." Hr'g Tr. 23:4–12. Pursuant to this second contention, Lumetra reads into FAR § 42.1500 a requirement that the reviewing agency should go beyond a binary evaluation of the protestor's comments and offer the protestor "an opportunity to know

how the agency was going to evaluate it for subjective purposes." Hr'g Tr. 26:17–20; *see also* Pl.'s Resp. at 10 (arguing that Dr. Straube should have performed a subjective evaluation that would "rate many aspects of Lumetra's performance" and "reconcile" the conflicting reports regarding Lumetra's performance on the eighth SOW).

CMS did not strictly satisfy the procedural requirements set forth in the second half of FAR § 42.1503(b), which require "review by a person with authority to direct the contracting officer's response." *Bannum,* 404 F.3d at 1351–52. Nevertheless, this court recognizes that Dr. Straube's review of the panel's conclusions provides a procedural safeguard that might mitigate any potential prejudice that accrued to Lumetra as a result of CMS' failure to allow Lumetra to comment upon the NIH report. Additionally, this court finds no basis for disregarding Dr. Straube's review on the second ground proffered by Lumetra; *i.e.,* that Dr. Straube was obligated to perform a more "subjective" assessment of Lumetra's comments. His task was to address whether the NIH panel of project officers correctly concluded that Lumetra had failed Task 1d1 of the eighth SOW, and that is precisely what he did.

Secondly, the government notes that during the negotiation phase of CMS' solicitation, Lumetra was able to enter comments upon Ms. Dickerson's questionnaire response on Form J–19 and the in-progress NIH evaluation. *See* Hr'g Tr. 84:8–15; 124:5–7. The government cites a letter sent by Brian Hebbel, the CMS contracting officer, to JoEllen Ross, the CEO of Lumetra, initiating a final round of negotiations for the QIO contract and notifying her of various issues that CMS had identified with Lumetra's proposal. Def.'s Cross–Mot. at 18 (citing AR 49–3701 (Letter to Lumetra from Brian Hebbel, RFP, Initiation of Negotiations (July 16, 2008))). The letter specifically alluded to CMS' con-

---

**15.** Dr. Straube does not stand in the same chain of command as Brian Hebbel, the contracting officer who reviewed Lumetra's objections to CMS' evaluation of Lumetra's past performance. *See* http://www.cms.hhs.gov/CMSLeadership/11_Office_OCSQ.asp (listing Barry Straube as the Director and Chief Clinical Officer of the Office

of Clinical Standards and Quality); http://www.cms.hhs.gov/CMSLeadership/10_Office_OAGM.asp (listing Brian Hebbel, the contracting officer for this procurement, as the Director of Division of Quality Contracts, which reports to Rod Benson in the Office of Acquisition and Grants Management).

cerns regarding Lumetra's past performance and recapitulated CMS' earlier findings that Lumetra

failed Task 1d1 (physician practice QI)—specifically it did not recruit enough identified participants, nor did it move its participants to "Use & Produce" electronic clinical information and "Care Management." The 1d1 recruitment & care management components are directly applicable to the 9th Scope Core Prevention, during which the QIO will have a shorter time period to achieve recruitment. Also, assisting PPs in expanding their use of Care Management is the key intervention in the ninth Scope.

AR 49–3701 (Letter to Lumetra from Brian Hebbel, RFP, Initiation of Negotiations). Lumetra responded to this letter by submitting its revised technical proposal, AR 56–3752 (Lumetra, Final Revised Technical Proposal, Vol. 1 (July 24, 2008)), which included a set of specific responses to the issues raised by Mr. Hebbel and identified various steps Lumetra was taking to improve its performance on the eighth SOW. *Id.* at 56–3844 to 56–3851. Lumetra "proposed certain changes attempting to mitigate past performance, including specific changes to recruitment, organizational changes and performance management." AR 73–4647 (Final Technical Evaluation Panel Summary, California Competition–July 2008, Lumetra). Three members of CMS' Technical Evaluation Panel evaluated Lumetra's submissions. *See* AR 74–4648 (Lumetra Scoresheet). These evaluations were synthesized in the Final TEP Summary, in which CMS increased Lumetra's past performance score from 70 to 75.67 points but still noted as a "deficiency" the finding that Lumetra had "failed Task 1d1 (physician practice QI)." AR 73–4646 to AR 73–4647 (Final Technical Evaluation Panel Summary, California Competition—July 2008). Lumetra objects that these discussions between the TEP and the contracting officer, which were required under FAR § 15.306, are "not the same as a review at a level above the contracting officer." Pl.'s Resp. at 9. Lumetra's distinction is legally correct, but the pertinent question becomes one of whether Lumetra was practically disadvantaged.

### 3. *Synopsis.*

Contrary to an applicable regulation, 48 C.F.R. § 42.1503(b), Lumetra was not able to obtain formal review of the NIH in-progress evaluation of its performance regarding the eighth SOW. Under the analytical framework set forth in *Bannum,* however, that procedural error is not necessarily fatal to CMS' actions in the procurement. Lumetra was able to challenge CMS' determination of a failure to achieve Task 1d1 of the eighth SOW through the statutory and regulatory review mechanism provided under 42 U.S.C. § 1320c–2(c)(4). *See supra,* at 545–46. Both that statutory review mechanism available for failed tasks and the subsequent opportunity to comment to CMS' contract officer about the failure during the negotiation phase of the solicitation helped mitigate any prejudice to Lumetra. *See Bannum,* 404 F.3d at 1358. The agency whose action was at issue in *Bannum* had conducted a similar review during the negotiation phase of the solicitation at issue in that case and similarly had increased the protestor's past performance award by a handful of points; there, as here, the increased past performance rating was "insufficient to alter the award outcome." *Id.* The Federal Circuit found that "[t]here [was] nothing besides Bannum's conjecture to support the contention that another review, comporting with the FAR, would provide it a substantial chance of prevailing in the bid. Bannum's argument rests on mere numerical possibility, not evidence." *Id.* There, any prejudice by a failure to provide meaningful review of a formal performance evaluation was adequately mitigated. So too here.

This court finds that CMS did not act in an arbitrary or unreasonable fashion when it considered Lumetra's performance under the eighth SOW. This court further rejects Lumetra's representation that "it could have easily received more technical points" if CMS had disregarded the NIH Report. *See* Pl.'s Mot. at 16. Lumetra claims that "if the two inconsistent and FAR [§ ] 42.1503(b)-noncompliant past performance reports reflecting Lumetra's eighth SOW are removed, the remaining past performance reports contain

scores that are as high as or higher than HSAG." Pl.'s Resp. at 11–12. But Lumetra has offered no evidence to demonstrate how it could have made up the difference in past performance scores with HSAG if CMS had continued to consider the failure to achieve Task 1d1. In sum, Lumetra has not established that but for the inclusion of the NIH Report in CMS' past performance evaluation, it would have had a substantial chance to receive the QIO contract. *See Bannum,* 404 F.3d at 1357. Accordingly, Lumetra was not prejudiced by CMS' consideration of that report.

## II. *PERSONNEL AND GOVERNANCE ISSUES*

Lumetra also contests CMS' evaluation of personnel and governance issues. CMS' personnel evaluation was scored by points, while CMS addressed governance issues as a matter of the offerors' responsibility to qualify for an award. For the personnel factor of the RFP, HSAG was awarded a total of 61 points and Lumetra was awarded a total of 71 points. AR 72–4633 (HSAG Score Sheet); AR 74–4648 (Lumetra Score Sheet). Separately, in its review of the two offerors' Corporate Governance Policies, Conflict of Interest Certifications, and Information Systems Security Plans, CMS determined that both Lumetra and HSAG were sufficiently responsible to perform the California QIO contract. AR 64A–4859 (HSAG's Corporate Governance Policies and Conflict of Interest Certification (July 28, 2008)); AR 64B–4860 (Lumetra's Corporate Governance Policies and Conflict of Interest Certification (July 28, 2008)).

### A. *Personnel*

1. *Weaknesses in HSAG's and Lumetra's proposals.*

██ In their proposals, the two prospective offerors exhibited varying degrees of experience with QIO contracting work. HSAG drew upon its experience in performing the QIO contracts for Florida and Arizona. Lumetra relied on its current employees performing the QIO contract for the eighth SOW in California.

Lumetra argues that "under the circumstances" underlying the offerors' proposals, CMS' comparative scoring of Lumetra's and HSAG's personnel proposals "lacks a rational basis and is contrary to the requirements of the RFP." Hr'g Tr. 33:23 to 34:2. The government responds that Lumetra has failed to identify any errors or actions taken by CMS that can be shown to be arbitrary or capricious. Def.'s Cross–Mot. at 26.

The personnel factor of the RFP was worth 90 total points and was divided into two equally weighted subparts, Key Personnel and Staffing Plan. AR 10B–1861 (RFP Sections L and M). The Key Personnel subfactor measures the "[d]egree to which each candidate is qualified for the position proposed and available to begin work at the start of the contract," while the Staffing Plan subfactor measures "the offeror's ability to provide qualified personnel in sufficient numbers to perform the work under the contract." *Id.* Lumetra attacks CMS' evaluation of HSAG's proposal as well as its own proposal.

### a. *CMS' scoring of HSAG's proposed personnel.*

First, on the Key Personnel subcategory, CMS gave HSAG 26.67 points and identified as a "significant weakness" HSAG's failure to name the employees who would serve as "key personnel during the non-transition portion of the contract." AR 71–4630 (Final Technical Panel Summary California Competition— July 2008 HSAG). HSAG proposed twelve key personnel; seven were identified as "transition" team members and five were listed as "TBD [To Be Determined]." *See* AR 60–4285 to 60–4286 (HSAG, Final Revised Technical Proposal (July 24, 2008)). The seven HSAG transition team members had gained experience through their work on QIO contracts in Florida and Arizona, but none had worked with a functioning QIO entity in California. *See, e.g., id.* at 60–4289 (listing Mary Ellen Dalton's resume), 60–4292 (listing Richard G. Potter's resume), 60–4297 (listing Cheryl Cook's resume). The government acknowledges that these transition personnel "weren't working in California" and that "upon award of the contract, [HSAG] would have to go about actively recruiting personnel to fill the staff." Hr'g Tr.

88:5–7. Lumetra argues that CMS improperly awarded more than half of the available Key Personnel points to HSAG despite its identification of the fact that many of HSAG's proposed personnel were listed as "TBD" or merely as "transition personnel." Pl.'s Mot. at 17–19. The government responds that CMS did in fact account for HSAG's personnel plans as a "significant weakness" in the Technical Evaluation Panel's final summary of HSAG's proposal. Def.'s Cross–Mot. at 27 (citing AR 71–4630 (Final Technical Evaluation Panel Summary, California Competition–July 2008, HSAG)). The government concludes that Lumetra has neither explained why CMS' scoring of this subfactor was unreasonable, Def.'s Cross–Mot. at 28, nor established a relevant metric explaining why HSAG should have been awarded fewer than 26.67 points. *See* Hr'g Tr. 86:16–21.

Second, on the Staffing Plan subcategory, HSAG again identified many proposed staff members as "TBD," and listed all remaining staff members as part-time employees. AR 60–4285 to 60–4286 (HSAG, Final Revised Technical Proposal).[16] CMS awarded HSAG 34.33 points and noted that HSAG "simply provides assurances that recruitment will occur for all positions within 90 days[;] … there remains a risk to the government that the offeror may be unable to recruit the necessary candidates for the work." AR 71–4630 to 71–4631(Final Technical Evaluation Panel Summary, California Competition—July 2008, HSAG). Lumetra objects to CMS' scoring on the grounds that "[t]he scoring ignored the acknowledged risk of not being able to recruit adequate staff." Pl.'s Mot. at 20. The government responds that CMS' Technical Evaluation Panel in fact acknowledged that HSAG's staffing plan might be insufficient to meet the QIO contract's requirements. Even after HSAG submitted a revised staffing plan exhibiting "[m]uch improved clarity on plans to staff components," the TEP still docked over ten points from HSAG's score on this subfactor. Def.'s Cross–Mot. at 28 (citing AR 71–4630 (Final Technical Evaluation Panel Summary, Cali-

fornia Competition–July 2008, HSAG)). The government adds that HSAG adjusted for its personnel shortages by "identif[ying] costs for recruitment and for relocation in their revised technical evaluation proposal." Hr'g Tr. 88:8–10.

### *b. CMS' scoring of Lumetra's proposed personnel.*

Lumetra was awarded 30 points under the Key Personnel subcategory and 41 points under the Staffing Plan subcategory. AR 74–4648. Lumetra's score for Key Personnel was docked in accordance with Section L.14 of the RFP, which requires each offeror to "identify and provide resumes for all key personnel for each Theme (C.6.1, C.6.2, and C.6.3)." AR 10B–1824 (RFP Sections L and M). One key Lumetra employee, Jenna Fischer, was not identified by resume. Pl.'s Mot. at 19. In its final evaluation of Lumetra's proposal, CMS noted that the absence of Jenna Fischer's resume "may have been an oversight," but nevertheless "ma[de] it impossible … to evaluate this person's qualifications." AR 73–4644 (Final Technical Evaluation Panel Summary, California Competition—July 2008 Lumetra). Lumetra characterizes its failure to include this staffer's resume as "a minor clerical error, one that was apparent from the face of [the] proposal." Pl.'s Mot. at 20. Lumetra points out that it was given a "plus-plus" score for key personnel on one of its past performance reviews, *see* AR 37–3536 (Lumetra, Past Performance Questionnaire Responses), "but, nevertheless, for not having one resume, 10 points were taken off." Hr'g Tr. 33:4–10. Lumetra notes that Ms. Fischer's resume was included in a different part of Lumetra's proposal, that for Theme 7.3, which was scored and considered separately by CMS. Hr'g Tr. 32:18–24. Lumetra contrasts its ten-point penalty with the fact that "HSAG had 20 points taken away, even though … it didn't have resumes for five key personnel, and six were just transitional." Hr'g Tr.

---

**16.** Employees with an "FTE [Full Time Employee]" rating of less than 1.0 were considered to be part-time employees.

33:11–13.[17] Lumetra concludes that it was "arbitrary and unreasonable" and "contrary to the RFP" for CMS to reduce its score in this manner. Pl.'s Mot. at 19–20.

### 2. CMS' evaluation of the proposals.

Lumetra bears the burden of demonstrating that CMS' personnel scoring lacked a rational basis. *Impresa Construzioni,* 238 F.3d at 1333. The Federal Circuit has emphasized the discretion of a procuring agency over "such matters as technical ratings." *E.W. Bliss,* 77 F.3d at 449. Lumetra argues that agency discretion "is not unfettered" and that this court may review an agency determination "for arbitrary, irrational or inconsistent treatment." Pl.'s Resp. at 13. Lumetra contends that the FAR requires agencies to evaluate offerors "on a fair and consistent basis." Pl.'s Resp. at 13 (citing FAR § 1.102–2(c); FAR § 15.305). Lumetra uses these principles to criticize as inconsistent the notion that CMS reduced Lumetra's total score on the Personnel factor by ten points for merely failing to include one employee's (Ms. Fischer's) resume, but reduced HSAG's score "by only 29 points, even though HSAG failed to provide names or resumes for *most* of its key positions." Pl.'s Resp. at 13 (emphasis added).

In applying the standard of review to an agency's procurement actions, this court does not engage in a subjective inquiry into the agency's specific ratings. Thus, while this court agrees with Lumetra that it can overturn an agency's "arbitrary" or "irrational" decision, *see* Pl.'s Resp. at 13, it evaluates the "consistency" of CMS' ratings primarily to insure that the agency "[c]onduct[ed] business with integrity, fairness, and openness," 48 C.F.R. § 1.102–2(c), and assessed offerors' relative qualities based "solely on the factors and subfactors specified in the solicitation."

48 C.F.R. § 15.305. The regulatory reference to consistency is found in FAR § 15.303(b)(3), which requires the source selection authority to "[e]nsure consistency among the solicitation requirements [and] ... evaluation factors and subfactors." In this respect, however, Lumetra has the obligation to provide evidence of CMS' application of different requirements or factors to the two offerors. It has not done so. So long as the agency does not apply different evaluative metrics to different parties, or engage in procedural violations or capriciousness, this court must allow the agency some leeway to mold its evaluations and its inquiries to the shapes of the differing proposals.

Here, Lumetra has established neither that the Technical Evaluation Panel actually failed to consider some relevant part of HSAG's or Lumetra's proposals nor that the Panel acted arbitrarily with respect to the parts of the proposals that it did consider. Lumetra's criticism of the agency's scoring of various strengths and weaknesses of the two offerors' proposals does not suggest that CMS failed to take into account any of these strengths or weaknesses. Accordingly, this court finds that Lumetra has failed to meet its burden of demonstrating that CMS' conclusions were "the product of an irrational process." *See Banknote Corp. of Am. v. United States,* 56 Fed.Cl. 377, 384 (2003), *aff'd,* 365 F.3d 1345 (Fed.Cir.2004). Lumetra's disagreement with the scores CMS has assigned to various aspects of the offerors' proposals is insufficient to establish that CMS acted arbitrarily and capriciously. *Id.*[18]

### B. Governance

#### 1. Responsibility determinations.

CMS reviewed each offeror's Corporate Governance Policies, Conflict of Interest Certifications, and Information Systems Security

---

**17.** Lumetra argues that its proposed staff members, unlike HSAG's, "are experienced, qualified, committed and ready to begin the ninth SOW on the first day of the contract." Pl.'s Mot. at 20.

**18.** Notably, even if this court were to find that CMS should have allowed Lumetra to submit Ms. Fischer's resume after the final evaluation had already taken place, this court would still be unable to find that Lumetra had suffered any prejudice as a result of CMS' failure to consider the resume. The 15–point difference between Lumetra's actual score on the Key Personnel subfactor (30 points) and a perfect score on that subfactor (45 points) is insufficient to make up the 50.67–point difference between HSAG's and Lumetra's overall technical scores. *See* AR 72–4633 (HSAG Score Sheet) (assigning HSAG a final technical score of 593.34); AR 74–4648 (Lumetra Score Sheet) (assigning Lumetra a final technical score of 542.67).

Plan "as part of a determination of responsibility required by FAR 9.1." AR 10B1862 (RFP Sections L and M). Under the FAR, the responsibility determination implements the government's policy that "[p]urchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only." 48 C.F.R. § 9.103(a). To make a responsibility determination, an agency applies "general standards," 48 C.F.R. § 9.104–1, as well as any applicable "special standards," also known as "definitive performance criteria." 48 C.F.R. § 9.104–2. General standards require that a contractor "[h]ave adequate financial resources," the ability to comply with performance schedules, "a satisfactory performance record," "a satisfactory record of ethics and integrity," and the necessary experience, skills, equipment, and facilities. 48 C.F.R. § 9.104–1. Special standards consist of requirements for unusual expertise or specialized facilities and are included when the "general standards are inadequate for a particular" procurement. *See John C. Grimberg Co. v. United States,* 185 F.3d 1297, 1301 (Fed.Cir.1999) (citing 48 C.F.R. § 9.104–1). Special standards "must be identified as such in the bid solicitation, must apply to all bidders, and *cannot be waived by the contracting officer.*" *Id.* (emphasis added).

Nowhere in the RFP does CMS identify any special or unusual performance standards that could not be waived. Section H.9 of the RFP does list various governance requirements relating to the composition of the offeror's governing body, service length and compensation, and compliance plan. AR 9I–1645 to 9I–1648 (RFP Section H). However, while the RFP notes that an offeror's governance policies "must be in conformance prior to contract award," it also provides that "[o]n a case-by-case basis, with proper justification, the Government may elect to waive the Section H.9 Governance Requirements or an element of those requirements." AR 10B–1839 to 10B–1840 (RFP Sections L and M). Section H.11 of the RFP outlines CMS' approach towards conflicts of interest and establishes that a contractor shall have a conflict mitigation program, shall submit disclosure statements for the organization and board members, and shall notify CMS of any plans to set up a subsidiary. AR 9I–1654 to 9I–1656 (RFP Section H). Again, in accordance with FAR § 9.503, CMS has reserved the authority to "waive an unresolved conflict." *Id.* at 9I–1656.

 An agency is given broad discretion in making general responsibility determinations because it will have to "bear the brunt of difficulties experienced in obtaining the required performance." *News Printing Co. v. United States,* 46 Fed.Cl. 740, 746 (2000) (quotation omitted). An agency's general responsibility determination is ordinarily reviewable only for "fraud or bad faith." *Id.* (citing *Trilon Educ. Corp. v. United States,* 217 Ct.Cl. 266, 578 F.2d 1356 (1978)).

### 2. CMS' waiver of governance requirements.

 Lumetra argues that HSAG failed to comply with the specific governance requirements set forth in Sections H.9 and H.11 of the RFP and that any waiver of those requirements by CMS was "limited" in scope. Pl.'s Resp. at 21–22.

In response to HSAG's request for a 30–day exemption from various governance requirements relating to its proposed QIO contracting team for California, AR 62–4446 (HSAG, Final Revised Proposal, Governance and COI, Vol. IX (July 24, 2008)), CMS issued a decision that "[w]e will grant this 30 day waiver of *one* governance guideline." AR 84–4768 (Mem. to Naomi Haney–Ceresa from Barry M. Straube, Waiver Requests for Governance Requirements under the ninth SOW (Aug. 6, 2008)) (emphasis added). With this memorandum, CMS' Chief Medical Officer waived HSAG's obligation under the RFP to make its governing body guidelines publicly available. *Id.* at AR 84–4767 to 84–4768.

Lumetra emphasizes the narrow scope of this waiver, arguing that it "does not address any of the other deficiencies in HSAG's proposal regarding governance" and "does not address HSAG's failure to comply with RFP Section H. 11." Pl.'s Mot. at 34. This court concurs and finds that CMS' waiver was given broader scope than the actual terms of the

waiver would indicate.[19] Rather than merely following Dr. Straube's decision and delaying HSAG's obligation to make its governing body guidelines publicly availability, CMS permitted HSAG to submit a proposal which stated that HSAG was deferring compliance with a number of governance requirements listed under Section H.9 of the RFP. AR 62–4446 (HSAG, Final Revised Proposal, Governance and COI, Vol. IX). Lumetra consequently argues that "numerous responsibility deficiencies" existed in HSAG's proposal and thus that "[i]t was arbitrary and capricious for CMS to award a contract to HSAG." Pl.'s Mot. at 34. First, Lumetra claims that HSAG falls short of the requirements under Section H.9 for lack of a board of directors and its failure to designate a compliance committee. Pl.'s Mot. at 33. Second, Lumetra asserts that HSAG never submitted a disclosure statement for the particular board that will govern its proposed operations in California. Pl.'s Mot. at 34. Finally, Lumetra cites section L.14 of the RFP, which states that "[t]he Offeror's Corporate Governance Policies must be in conformance *prior* to contract award." Pl.'s Mot. at 33 (citing AR 10B–1839 to 10B1840 (RFP Sections L and M)) (emphasis added). Lumetra concludes that HSAG's failure to meet these and other "mandatory responsibility requirement[s]" under the RFP rendered HSAG "ineligible" for the QIO contract award. Pl.'s Resp. at 22.

The government responds in two ways. First, the government, citing this court's limited review of an agency's responsibility determinations, argues broadly that Lumetra "has no grounds to challenge CMS' evaluation of HSAG's governance submissions." Def.'s Cross–Mot. at 42; *see also* Hr'g Tr. 102:12–16. Secondly, the government points out that the requirements of the RFP are not the kinds of "definitive responsibility criteria" that would automatically disqualify an offeror if they are not met. Def.'s Cross–Mot. at 42–43. Defendant reads "significant flexibility" into the RFP's governance requirements, reasoning that "if an entity was not already an incumbent in a particular state, it would likely require a short period of

time after award to come into compliance with those requirements." Def.'s Cross–Mot. at 44. The government argues that the waiver granted to HSAG applied to "perhaps the most significant factor with regards to this governance, and that's coming up with the governing body," and thus that the waiver that was granted should be applied broadly. *See* Hr'g Tr. 102:17 to 103:9.

Because CMS has specified that the governance requirements set forth in the RFP might be waived, *see, e.g.,* AR 10B–1840 ("[o]n a case-by-case basis, with proper justification, the Government may elect to waive the Section H.9 Governance Requirements or an element of those requirements."), this court agrees with the government that the governance requirements did not constitute definitive performance standards. *See John C. Grimberg,* 185 F.3d at 1301. Instead, the governance requirements set out in the RFP were incorporated into CMS' general responsibility determination, and, as such, CMS could award a contract to an offeror that did not comply as a technical matter with all of the requirements. In these circumstances, the scope of the waiver was not material to CMS' ultimate decision to award the contract to HSAG. By waiving the requirement that HSAG immediately publish its governing body guidelines, CMS made manifest its understanding that it would take time for HSAG to set up its organization in California. As the government points out, CMS was in the best position to determine whether HSAG was likely eventually to meet the governance requirements underlying the responsibility determination. *See* Def.'s Cross–Mot. at 45. Lumetra has failed to allege that CMS exhibited any fraud, bad faith, or bias in making its responsibility determination; thus this court finds that CMS acted within its discretion as a contracting agency when it found HSAG to be a responsible offeror eligible for an award.

## III. COST EVALUATION AND COST-REALISM ANALYSIS

CMS, as part of its best value determination, was obliged by the RFP to "evaluate

---

**19.** As Lumetra notes, the waiver that CMS granted was not issued to HSAG until August 6, six

days after the contract was awarded to HSAG. Hr'g Tr. 55:18–20.

each proposal, perform a cost analysis to determine if the costs are fair and reasonable, and perform a cost realism analysis." AR 10B–1858 (RFP Sections L and M). The cost evaluation and cost-realism analysis— neither of which were numerically scored— were the two components of the agency's business-proposal evaluation. *See id.* at 10B–1865. During the cost evaluation, CMS analyzed offerors' business proposals to determine "the fairness and reasonableness of the proposed costs." *Id.* Separately, in the cost-realism assessment CMS examined specific elements of the offerors' proposed costs in the context of the contract's requirements to determine whether the costs were reasonable and realistic "for the work to be performed." *See id.*

CMS issued a memorandum in which it evaluated the costs in the offerors' final revised proposals. CMS found that "HSAG proposed costs of $31,102,514 to work with 317 providers, for an average cost of $98,115 per provider." AR 82–4757 (Price/Cost Negotiation Memorandum). By contrast, CMS found that "Lumetra proposed costs of $46,632,082 to work with 527 providers, for an average cost of $88,486 per provider, noting that "[t]he Lumetra proposal had a 10.9% advantage per provider in costs and the HSAG proposal had a 9.3% technical advantage." " *Id.* The memorandum concluded that

> [a]lthough both Offerors have submitted proposals that are technically acceptable, the HSAG proposal was of higher technical merit and it would not otherwise benefit the government to spend the additional $15 million that Lumetra proposes to accomplish the work of the 9th SOW QIO contract.

*Id.* This reasoning was reflected in the decision to award the contract to HSAG. *See* AR 81–4750 (Contracting Officer Award Decision, QIO Contract for the State of California (July 30, 2008)).

### A. Standard of Review

An agency's cost-realism and cost-evaluation analyses are reviewed under a standard that is similar to that which applies to an agency's past performance, personnel, and governance determinations. Significant discretion is vested in the agency and "to overturn a cost realism decision[,] plaintiff must demonstrate that the choice made by the agency was irrational." *JWK Int'l Corp. v. United States,* 49 Fed.Cl. 371, 393 (2001), *aff'd,* 279 F.3d 985 (Fed.Cir.2002). "Impeccable rigor" on the part of the agency is not required; rather, the cost-realism analysis "must reflect that the agency took into account the information available and did not make irrational assumptions or critical miscalculations." *Id.* (citing *OMV Med., Inc. v. United States,* 219 F.3d 1337, 1344 (Fed.Cir. 2000)). Furthermore, in the broader context of the agency's best-value determination, "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss,* 77 F.3d at 449. This best value determination does not "sacrifice qualitative analysis and the exercise of judgment in favor of rigid quantitative results." *Cubic Def. Sys., Inc. v. United States,* 45 Fed.Cl. 450, 469–70 (1999).

### B. The Agency's Cost Evaluation

■ Lumetra sets forth various challenges to CMS' cost-evaluation analyses. Lumetra argues that CMS failed to account for the offerors' differing levels of service, HSAG's lower proposed cost per case review, and HSAG's relatively low proposed costs for experienced personnel. Pl.'s Mot. at 23–25. Lumetra also contends that CMS permitted HSAG to "game" the evaluation process by proposing an unbalanced approach to case reviews and took no notice of HSAG's failure to comply with the RFP's instructions regarding proposed labor hours for case reviews. Pl.'s Mot. at 23–31.

Lumetra contends that CMS should have performed "a cost/technical analysis based on Lumetra's 10.9% cost advantage per provider as compared to HSAG's 9.3% technical advantage." Pl.'s Mot. at 7. In the alternative, Lumetra suggests that CMS "should have given Lumetra additional evaluation credit for proposing to work with 210 more providers, or taken away evaluation credit from HSAG for proposing to work with 210 fewer providers." Pl.'s Mot. at 8. Lumetra argues that CMS' failure to take either of these

analytical steps was "arbitrary and irrational," because an analysis that simply compares "raw or total costs without consideration of the number of providers served" fails to analyze "the most probable cost to the government." Pl.'s Mot. at 8 (citing FAR § 15.404–1(d)). The government responds that "neither the RFP nor any general best value analysis required CMS to consider [an] offeror's cost-per-provider, and thus any greater advantage Lumetra might have had in [that regard] is irrelevant." Def.'s Cross–Mot. at 33.

Essentially, the government objects to Lumetra's proffered cost-per-provider metric as "an arbitrary quantitative metric . . . that has no basis in the RFP, the FAR, or any other authority governing the administrati[on] of Government contracts." Def.'s Cross–Mot. at 13. Additionally, citing the degree of discretion vested in the agency, the government argues that "Lumetra's proposed metric would greatly undermine the contracting officer's ability to exercise his discretion and judgment." *Id.*

This court finds that CMS' cost-evaluation comparison was based not on the offerors' average cost per provider, as Lumetra argues, but instead on the offerors' ability to meet the requirements under the contract. There is nothing in the FAR and the RFP to indicate that CMS had to perform the type of quantitative comparison suggested by Lumetra. The FAR and the RFP instead promoted a more contextual and qualitative evaluation of costs. When analyzing costs, one offeror's proposal was not to be compared directly against another offeror's proposal; rather, each offeror's proposal was to be independently reviewed to determine whether the costs involved "are realistic, fair, and *reasonable.*" *See* AR 10B–1865 (RFP Sections L and M) (emphasis added). The cost analysis did not employ the same quantitative rigors as the agency's determination of technical merit.

The RFP neither required nor suggested that offerors should receive, in Lumetra's words, "additional technical evaluation credit for proposing working with more providers." *See* Pl.'s Mot. at 8. Each offeror was entitled to propose its own best estimate of the num-

ber of providers with which it proposed to work, and the agency independently evaluated those estimates to determine whether they were realistic. *See* 48 C.F.R. § 15.404–1(d). Lumetra was under no requirement to propose to work with a higher number of service providers. As plaintiff acknowledged at oral argument, "there is no requirement in the contract that tells you how many reviews you have to do." Hr'g Tr. 46:7–9 Rather, the agency had discretion to consider whether the number of providers with which an offeror proposes to work is reasonable. This is consistent with the principle in the FAR that under a cost-reimbursement contract, the probable cost of performance "should reflect the Government's best estimate of the cost of any contract that is most likely to result from the offeror's proposal." 48 C.F.R. § 15.404–1(d)(2)(i). Again, this phrasing in the FAR reflects the qualitative nature of the evaluation CMS was tasked to perform. Given that the agency under a cost-reimbursement contract does not necessarily plan to order more work than that which the contractor has proposed, this court concurs with defendant's observation that

> the most probable cost analysis for HSAG requires consideration of its 327 providers. The most probable cost analysis for Lumetra requires consideration of its most probable cost in using 517 providers.

Hr'g Tr. 120:13–17. Contrary to plaintiff's contention, *see* Pl.'s Mot. at 21, the emphasis in the FAR on "probable cost of performance" does not imply that the agency must compare ratios that have been abstracted away from the actual costs and services described in the context of the offerors' proposals. The FAR gives an agency the discretion to "adjust an offeror's costs either upward or downward to reach realistic levels," *see* Pl.'s Mot. at 21, but does not require such an adjustment to take place in accordance with Lumetra's proffered metric of cost-per-provider. *See* 48 C.F.R. § 15.404–1(d)(2)(ii).

Accordingly, this court finds that the agency was neither arbitrary nor irrational in performing its cost analysis. It was within the agency's discretion not to award a higher technical score to Lumetra for proposing to work with 210 more providers than HSAG.

This court accepts CMS' exercise of judgment as to its qualitative analysis of the offerors' proposals and refrains from interposing a quantitative criterion that the contracting agency had not stated in the RFP in analyzing the costs of competing proposals. *See Cubic Def. Sys.*, 45 Fed.Cl. at 469–70.

### C. Realism of the Offerors' Proposed Costs

Lumetra additionally argues that CMS' "evaluation record does not … include a more than cursory review of most of the proposed costs" and concludes that CMS "failed to conduct a proper … cost realism analysis." Pl.'s Mot. at 21. The government responds that "[t]he administrative record clearly reflects CMS'[ ] detailed analysis of the proposed costs of both HSAG and Lumetra and shows that CMS adjusted those proposals as necessary to reflect each offeror's most probable costs." Def.'s Cross–Mot. at 32.

### 1. Costs associated with case reviews.

RFP, Theme 6.1 (Beneficiary Protection) consists of three types of work: case reviews; quality improvement, ADR, and sanctions; and other beneficiary activities. AR 4–49 to 4–54 (Solicitation RFP). Lumetra proposed that its costs for the activities grouped under Theme 6.1 would be $24,839,004. AR 57–4080 (Lumetra, Final Revised Business Proposal (July 24, 2008)). HSAG proposed that its costs under Theme 6.1 would be $13,824,101. AR 61–4334 (HSAG, Final Revised Business Proposal (July 24, 2008)). In criticizing HSAG's proposal, Lumetra focuses on HSAG's estimated costs for case review work, characterizing HSAG's proposed costs as "unreasonable." Pl.'s Mot. at 24. Lumetra argues that "[b]ecause the government will be responsible for any excess costs, CMS should have substantially adjusted the HSAG shortfall" in its analysis of probable costs. *Id.* Lumetra claims that "[i]f CMS had performed a proper analysis, HSAG's proposed cost for case review should have increased." *Id.* at 25.

The government responds that the agency did in fact take into account HSAG's low projections as to quality-of-care case review and adjusted HSAG's proposed costs as a result. *See* Def.'s Cross–Mot. at 35. The agency's Business Proposal Evaluation of HSAG's initial proposal found that "HSAG's proposed labor hours per quality of care review of 3.2 professional hours and .7 support hours per case is [sic] not realist[ic] or reasonable to complete the contract requirements or the proposed technical approach." AR 29–3457 (HSAG, Business Proposal Evaluation). As a result, in its final proposal, HSAG increased its proposed hours for quality-of-care case review. AR 61–4320 (HSAG, Final Revised Business Proposal). Upon reviewing HSAG's final proposal, the agency still found that HSAG's estimate of 4.0 professional hours and 2.0 support hours for that type of case review was "not realist[ic] or reasonable." AR 70–4610 (Business Proposal Evaluation—HSAG). The agency stated that "[a] reasonable number of hours … to conduct each quality of care review, based on historical data, [is] 8.5 professional hours and 1.5 support hours." *Id.* Consequently, CMS' contracting officer determined that "the contractor proposal was underestimated by $448,273" on direct labor costs, and adjusted HSAG's proposed costs to add that amount. AR 82–4760 (Price/Cost Negotiation Memorandum).

Lumetra, however, contends that CMS "made only marginal adjustments to HSAG's proposed costs for Theme 6.1." Pl.'s Resp. at 15. Lumetra claims that CMS generally "ignored [the] sharp criticism" of HSAG's proposal from David Russo, a CMS project officer and member of the Technical Evaluation Panel. Pl.'s Mot. at 24. In an e-mail to Theresa Rice, Mr. Russo wrote that

> [HSAG] proposes 34,099 case reviews and associated costs of $12,776,529. This translates to $374.69 per review and approximately six hours per review. This is wholly inadequate to execute the offeror's technical approach. While some efficiencies may be realized through an economy of scale (i.e., the offeror otherwise conducting case review activities for the Arizona and Florida QIOs), the government accepts the substantial risk that the offeror will be unable to achieve these highly aggressive expectations. Specifically, most types of case reviews have appeal or re-review opportunities for physicians and/or beneficia-

ries which will add substantial time and resources to each case. To suggest that, on average, cases can be completed for a cost of $374.69 is profoundly unrealistic and infeasible.

AR 93–4968 (E-mail from Russo to Rice (July 27, 2008)). Lumetra argues that CMS ignored the broader thrust of Mr. Russo's criticism and only made an incremental adjustment to the quality-of-care portion of HSAG's case-review proposal, see Pl.'s Reply at 16, noting that the agency added four hours per case review to only 2,380 out of 34,099 total case reviews. *Id.* (citing AR 70–4610 (Business Proposal Evaluation—HSAG)). Lumetra suggests that this minor adjustment to HSAG's proposal violates the requirement in the RFP that "[t]he QIO's proposed number of hours per case should equal their historical number of hours per case or the national median number of hours per case, whichever is less." Pl.'s Reply at 17 (quoting AR 4–397 (Solicitation RFP Attachment J–7)). At oral argument, plaintiff proffered an exhibit describing a wholesale adjustment to HSAG's proposal whereby *all* of HSAG's case reviews of whatever type were increased to ten labor hours per case review. Hr'g Tr. 40:5 to 42:12. Based on the calculations in this exhibit, Lumetra concludes that HSAG's proposals "should have been adjusted up by $6.2 million to reflect a reasonable number of hours for case review." Hr'g Tr. 42:10–12.

This court rejects plaintiff's criticisms of CMS' evaluations. Lumetra itself did not propose to spend ten direct labor hours on any of the types of case reviews other than quality-of-care case reviews. *See* AR 57–4077 to 57–4078 (Lumetra, Final Revised Business Proposal) (listing direct labor hours for utilization reviews, hospital based notice

appeals, fee-for-service expedited appeals, Medicare Advantage fast track appeals, Emergency Medical Treatment and Active Labor Act ("EMTALA") five-day reviews, and EMTALA 60–day reviews). Moreover, the court finds that HSAG's projection of the number of hours it would spend on the other types of case reviews was implicitly based on HSAG's "historical number of hours per case." *See* AR 4–397 (Solicitation RFP Attachment J–7). The government notes that CMS adjusted HSAG's hours on quality-of-care case reviews to an appropriate level "based upon the historical rates of HSAG's subsidiary FMQAI [Florida Medical Quality Assurance], which is the QIO in Florida, which would be doing these case reviews." Hr'g Tr. 99:24 to 100:3. This is in keeping with the requirements of RFP Attachment J–7. Furthermore, there is circumstantial evidence indicating that neither offeror was historically accustomed to spending ten hours per case review on these other categories.[20]

Given that CMS reevaluated HSAG's proposed labor hours for quality-of-care case reviews based upon historical data and consequently increased HSAG's proposal to a reasonable number of hours, and given that HSAG's proposed hours for other types of case reviews are not materially different from Lumetra's and otherwise accord with the historical data, this court finds that CMS properly evaluated the realism of HSAG's proposed labor costs for case reviews.

### 2. Other proposed costs.

Lumetra identifies several additional aspects of HSAG's proposal that it contends CMS should have adjusted, including HSAG's proposed personnel costs, HSAG's proposed distribution of case reviews over

---

**20.** CMS and both offerors recognized that the number of hours per case review would differ depending on the type of case review being performed, as is demonstrated by the offerors' differing estimates on the different categories of case reviews. *See* AR 57–4077 to 57–4078 (Lumetra, Final Revised Business Proposal). In this vein, Mr. Russo initially made use of a simple ratio to compare the offerors' costs per case review. *See* AR 93–4968 (E-mail from Russo to Rice). However, this court concurs with defendant that "simply dividing the total numbers is of no probative value" where each type of case

review had markedly different average hours based on historical data. Def.'s Cross–Mot. at 36 n. 17; *see, e.g.,* AR 4–397 (Solicitation RFP Attachment J–7) (setting out the national median professional hours per case for the other reviews, none of which exceeded 6.2 hours per case; the national median professional time per case for hospital-based notice appeals was 6.2 hours; that for Medicare Advantage fast-track appeals was 5.2 hours; that for fee-for-service expedited appeals was 5.6 hours; that for hospital-request higher weighted diagnosis-related groups was 2.7 hours; and that for EMTALA was 5.4 hours).

Theme 6. 1, and the "risk" of HSAG's low proposed price. *See* Pl.'s Mot. at 25–31. This court rejects Lumetra's claims and finds that the agency's cost-realism analysis was sufficiently thorough to blunt Lumetra's various objections. First, HSAG's proposed costs for personnel were based on hiring "appropriate staff members currently employed by the incumbent contractor," as well as "additional staffing as needed." AR 60–4280 (HSAG, Final Revised Technical Proposal). Lumetra cannot identify any grounds on which the agency's detailed cost analysis of HSAG's personnel proposal was irrational or unreasonable. Second, the offerors' proposed distribution of case reviews did not show salient differences that would enable a determination that one proposal was more "balanced" than the other. Finally, the agency's cost-realism analysis carries with it an implied evaluation of the comparative risks of the offerors' proposals, rendering a separate risk evaluation unnecessary. *See* AR 10B–1809 (RFP Sections L and M) (stating, in section L.2(f)(9), that "[i]f a cost realism analysis is performed, cost realism may be considered by the source selection authority in evaluating performance or schedule risk.").

In conclusion, this court finds that CMS did not ignore HSAG's proposed costs, but rather adjusted them to accord with CMS' experience. The agency is vested with discretion over its cost-realism and cost evaluation analyses, *see JWK Int'l Corp.,* 49 Fed.Cl. at 393, and Lumetra has failed to identify any arbitrary or irrational choices made by the agency in the course of exercising its discretion.

## IV. UNEQUAL DISCUSSIONS

 Finally, Lumetra contends that CMS conducted technical and cost discussions with HSAG and its affiliate, Florida Medical Quality Assurance, Inc., as renewal contractors, concerning information that was not available to Lumetra or the general public. *See* Pl.'s Mot. at 34–35. Lumetra claims that these discussions took place prior to CMS' negotiations with the competing contractors, Hr'g Tr. 56:24 to 57:1, and that Lumetra was "materially prejudiced" as a result. *See* Pl.'s

Mot. at 34. Lumetra alleges that the following source selection information was disclosed: CMS' available funding for the QIO procurement, "guidance on preparing technical and business proposals," "total cost calculations for" Theme 6.1 (Beneficiary Protection) work, "funding amount[s]" for "quality data reporting," estimates of units and prices for Theme 6.2 (Patient Safety) work, the "number of providers and [estimated price] per provider" for Theme 6.3 (Core Prevention) work, "specific reductions in provider volumes," and various other nonpublic information. *Id.* at 34–35. From the discussions, Lumetra suggests that HSAG may have learned, among other facts, the number of quality-of-care case reviews that the government intended to have performed. Hr'g Tr. 60:8–11. Lumetra posits that this knowledge would have given HSAG a decided advantage in crafting its business proposal with regard to case reviews. *See* Pl.'s Mot. at 35.

The FAR states that an unfair competitive advantage arises when where an offeror possesses "(1) [p]roprietary information that was obtained from a Government official without proper authorization; or (2) [s]ource selection information ... that is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract." 48 C.F.R. § 9.505(b). Recently, this court defined an unfair competitive advantage as a situation where an offeror "would have ample opportunity to tilt the competition in its favor and would possess a unique understanding of the agency's future requirements." *Alabama Aircraft,* 83 Fed.Cl. at 687 (quotation omitted). An earlier GAO decision states that "an unfair competitive advantage is presumed to arise where an offeror possesses relevant nonpublic information that would assist that offeror in obtaining the contract, without the need for an inquiry as to whether that information was, actually, of assistance to the offeror." *Aetna Gov't Health Plans, Inc.,* B–254397, 1995 WL 449806, at *12 n. 16 (G.A.O. July 27, 1995). Lumetra cites *Aetna Health* for the principle that "it is not the burden of the offeror who did not receive the information to explain how the non-public information helped the other offeror." Hr'g Tr. 57:16–18.

From the record, however, it is not evident that HSAG had access to "relevant nonpublic information." The information in the renewal letters sent to HSAG and Florida Medical Quality Assurance does not appear to have been directly relevant, because it was specific to Florida and Arizona and contained funding and participant amounts that differed from the amounts in the California QIO competition. *See* AR 117–5475 (Letter from Brian Hebbel, CMS, to HSAG re: RFP Arizona Ninth SOW, Attach. B (May 1, 2008)) (identifying "Funding and Participant Amounts" for Arizona); AR 118–5485 (Letter from Brian Hebbel, CMS to Florida Medical Quality Assurance re: RFP Florida Ninth SOW, Attach. B (May 1, 2008)) (identifying "Funding and Participant Amounts" for Florida). No information in those letters directly pertained to the competition for the California QIO contract.

Moreover, Lumetra itself engaged in discussions with CMS prior to its submission of a revised proposal for the California QIO contract. *See* AR 49–3697 (Letter to Lumetra from Brian Hebbel, RFP Initiation of Negotiations (July 16, 2008)). Lumetra's own discussions with CMS were related to the QIO contract in California rather than Arizona or Florida, and, during these discussions, CMS issued various questions, suggestions, and requests regarding Lumetra's revised proposal for the California contract. *See id.* The government argues that during this detailed discussion of Lumetra's proposal for the California contract, Lumetra "was able to ask any questions or raise any issues it may have had, and those discussions resulted in CMS providing questions and suggestions for Lumetra to address in its revised proposal." Hr'g Tr. 104:9–13.

Based upon its review of the record, the court has been unable to locate any relevant information to which HSAG had access but Lumetra lacked access. Lumetra has thus not offered sufficient evidence to establish an "unequal access to information" claim. *See Alabama Aircraft,* 83 Fed.Cl. at 688–90; *Systems Plus, Inc. v. United States,* 69 Fed. Cl. 757, 770–71 (2006).

In addition, given the timing of HSAG's discussions with CMS, it is not evident how HSAG would have been able to use any information gained respecting renewal contracts in Florida and Arizona "to tilt the competition in its favor" respecting the California contract. *Alabama Aircraft,* 83 Fed. Cl. at 687. Discussions about the renewal of contracts for Florida and Arizona were initiated by letters dated May 1, 2008. *See* AR 117–5467 (Letter from Brian Hebbel, CMS, to HSAG re: RFP Arizona Ninth SOW); AR 118–5476 (Letter from Brian Hebbel, CMS to Florida Medical Quality Assurance re: RFP Florida Ninth SOW). As the government points out, May 1 is two weeks *after* HSAG submitted its initial proposal for the California QIO contract on April 16, 2008. *See* AR 19–2271 (HSAG Technical Proposal (Apr. 18, 2008)). Thus, any information HSAG gained about the Florida and Arizona renewals could not have been of benefit in shaping its initial proposal for California. And, HSAG's final proposal showed relatively minor changes from its initial proposal. *See supra,* at 547.

In *Aetna Health,* the GAO opined that a claim of a conflict of interest "must be based upon hard facts, rather than mere suspicion." 1995 WL 449806, at * 12. Here, Lumetra speculates that "CMS and HSAG *could have* discussed various strategies for carrying out the [QIO] work[,] … *could have* discussed overhead rates and how those rates would be impacted by award of contracts in Arizona, Florida and California (as well as Mississippi)[, and] *could have* discussed staffing plans in terms of using staff in multiple states." Pl.'s Mot. at 35 (emphasis added). Plaintiff additionally suggests that "what [HSAG] learned about Florida and Arizona … has some transferability to California." Hr'g Tr. 62:12–14. But Lumetra is unable to point to any hard facts showing that CMS' discussions with HSAG and Florida Medical Quality Assurance about the Florida and Arizona renewals gave HSAG access to "relevant nonpublic information." Accordingly, this court rejects Lumetra's claim that CMS engaged in prejudicial, unequal discussions with HSAG.

## CONCLUSION

For the reasons stated above, Lumetra's motion for judgment on the administrative

record is DENIED. The government's cross-motion for judgment on the administrative record is GRANTED. For good cause shown, Lumetra's motion for supplementation of the administrative record is GRANTED IN PART and DENIED IN PART.[21]

CMS' award of a contract under Solicitation Number CMS–2007–QIOninthSOW–NAHC to HSAG is sustained.

The clerk is directed to enter judgment for the government in accord with this decision. No costs.

Because this decision might contain "confidential or proprietary information" within the meaning of RCFC Appendix C, ¶ 4, and the protective order entered in this case, it is being issued under seal. The parties are requested to review the decision and to file proposed redactions on or before November 19, 2008.

It is so ORDERED.

---

**21.** To the extent that Lumetra's motion for supplementation concerns documents that were not part of the record before CMS at the time it made the decisions contested by this protest, the materials are accepted into the record for purposes of addressing prejudice and the factors pertaining to equitable relief. *See Alabama Aircraft Industries, Inc. v. United States,* 82 Fed.Cl. 757, 763–65 (2008).