HOLLOWAY & COMPANY, PLLC, Plaintiff,

v.

UNITED STATES, Defendant,

and

Grant Thornton, LLP, Intervening Defendant.

No. 09–53C.

United States Court of Federal Claims.

Filed Under Seal: May 7, 2009.

Reissued: May 14, 2009.

Baylor and Dawn R. Jackson, Baylor & Jackson, PLLC, Washington, D.C.

Antonia R. Soares, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Michael F. Hertz, Acting Assistant Attorney General, Civil Division, and Jeanne E. Davidson, Director, and Mark A. Melnick, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Douglas W. Kornreich, Attorney, Department of Health and Human Services, Baltimore, Maryland.

Alexander J. Brittin, Brittin Law Group PLLC, Vienna, Virginia, for intervening defendant. Of counsel were Ellen F. Randel, Grant Thornton LLP, Alexandria, Virginia, and Jonathan D. Shaffer and Mary Pat Gregory, Smith Pachter McWhorter PLC, Vienna, Virginia.

## OPINION AND ORDER[1]

LETTOW, Judge.

This is a post-award bid protest regarding a procurement of auditing services for the Centers for Medicare and Medicaid Services ("CMS"). The procurement involved a competition among holders of Federal Supply Schedule contracts issued by the General Services Administration, and was conducted in accord with Federal Acquisition Regulation ("FAR") Subpart 8.4, 48 C.F.R. Subpart 8.4. The protest comes before the court after two rounds of proceedings at the Government Accountability Office ("GAO"), the first of which resulted in corrective action by CMS.

The case in this court has been expedited. The administrative record was filed on February 6, 2009, and cross-motions for judgment on that record were submitted prompt-

Pamela L. Ashby, Baylor & Jackson, PLLC, Washington, D.C., for plaintiff. With her during the proceedings were Brynee K.

1. Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(7)of the Rules of the Court of Federal Maims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before May 13, 2009. A hearing on redactions was held on May 14, 2009. The resulting redactions are shown by asterisks enclosed by brackets as follows: "[* * *]."

ly thereafter by the parties.[2] Those motions have been fully briefed and were addressed at a hearing held on April 14, 2009. The case is now ready for disposition.

## FACTS[3]

### A. Solicitation and Award

CMS, a unit within the Department of Health and Human Services, administers various federal programs, including Medicare, Medicaid, the Prescription Drugs program, the State Children's Health Insurance Program ("SCHIP"), and the Clinical Laboratory Improvement Amendments of 1988, Pub.L. No. 100–578, 102 Stat. 2903. *See* AR 1–3 (Request for Quote ("RFQ") (Dec. 14, 2007)).[4] The management of CMS is tasked with "developing and maintaining effective internal control[s] to achieve effectiveness and efficiency of operations, reliability of financial reporting, and compliance with applicable laws and regulations." AR 1–2(RFQ). Revised Circular No. A–123, which binds agencies including CMS to "document and assess internal controls over financial reporting," was issued by the Office of Management and Budget on December 21, 2004 and became effective in Fiscal Year 2006. *Id.* In particular, Appendix A to Circular A–123 requires the heads of various federal agencies to document and report the results of their financial assessments each year in a management assurance statement. *Id.*

CMS's financial outlays are quite large, totaling approximately $515.2 billion in 2006, and effective internal controls over financial reporting of CMS's expenditures are correspondingly significant. *See id.*

On December 14, 2007, pursuant to Circular A–123, CMS issued RFQ APP80128, styled "A–123 Review of CMS Internal Controls for Financial Reporting." AR 1–1 (RFQ). This RFQ invited prospective offerors to prepare bids for fixed-price work consisting of documenting the internal control processes used for financial reporting by CMS and its contractors; developing protocols to review the financial reporting controls at CMS headquarters, offices of CMS contractors, and regional data centers; testing the design and operating effectiveness of the financial reporting controls at these locations; and developing reports and action plans relating to problems thereby identified. AR 1–4(RFQ). CMS determined that there were sufficient vendors holding contracts under Federal Supply Schedule ("FSS") 520, entitled "Financial and Business Solutions," SIN 13: Complementary Financial Services, to justify procuring the desired services from among the FSS holders. AR 17–1182 (Negotiation Memorandum (Feb. 21, 2008)).[5] On December 14, 2007, CMS sent the RFQ for the A–123 contract to five small-business vendors it had selected from among those who held FSS 520 schedule contracts, and, upon request, also distributed the RFQ to

---

**2.** Following an initial conference in the case, the offeror receiving the award, Grant Thornton, LLP, was granted leave to participate in the case as an intervening defendant. Order of Feb. 2, 2008, Docket no. 16. Grant Thornton participated actively in the proceedings held thereafter.

**3.** The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement and the parties' evidentiary submissions. *See Bannum, Inc. v. United States,* 404 F.3d 1346, 1356 (Fed.Cir. 2005) (bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"); *Santiago v. United States,* 75 Fed. Cl. 649, 653 (2007) ("In accord with RCFC 52. 1, the court 'is required to make factual findings … from the [administrative] record as if it were conducting a trial on the record.'" (quoting *Acevedo v. United States,* 216 Fed.Appx. 977, 979 (Fed.Cir.2007))).

Other findings of fact and mixed findings of fact and conclusions of law are stated in the analysis which follows.

**4.** "AR___" refers to the administrative record filed with this court in accordance with RCFC 52.1(a). The administrative record has been subdivided into tabs. The first number in a citation to the administrative record refers to a particular tab, and the number after the hyphen refers to the particular page number within that tab, *e.g.,* "AR 8–395." The pages of the administrative record are paginated sequentially without regard to the tabs; consequently, the pagination of each tab after tab 1 begins with a number greater than one.

**5.** Under the Federal Supply Schedules set up by the General Services Administration, federal agencies acquire commonly used services through streamlined procedures and at previously negotiated rates. *See* 48 C.F.R. [FAR] § 8.402(a).

five additional GSA vendors. *See* AR 16–1166 (Source Selection Document (Feb. 21, 2008)).[6] Included among the recipients of the RFQ were Holloway, Grant Thornton, and PriceWaterhouseCoopers. *Id.*

The A–123 contract described by the RFQ included a nine-month base year and four one-year option periods. AR 4–110 (Amendment # 2 to RFQ (Jan. 8, 2008)).[7] CMS indicated that this was a firm fixed-price contract, in which the contractor was to be paid a proportion of the total firm fixed price as it completed various deliverables. AR 4–110 to 111 (Amendment # 2 to RFQ). In the RFQ, CMS stated that the contract would be awarded "to the responsible offeror whose proposal represents the 'best value' after evaluation." AR 4–157 (Amendment # 2 to RFQ). CMS planned to make this best-value determination by

*using a trade-off method in which both technical/management merits are approximately equal to cost/price.* This will be determined by a trade-off technique that allows the government to consider award to either the lowest price/cost offeror or other than the highest technically rated offeror. It also permits trade-offs among cost/price and noncost/price evaluation factors. In making the comparison, the [g]overnment is concerned with striking the most advantageous balance between technical/management features and cost to the government.

*Id.* (emphasis added).

CMS asked prospective offerors to submit technical proposals and informed them that their proposals would be evaluated by a Technical Evaluation Panel, applying the technical criteria set forth in the RFQ. AR 4–157 (Amendment # 2 to RFQ). Under CMS's approach, an offeror would be able to earn a total of 400 points for its technical proposal, based upon the following criteria: (1) "experience [and] past performance in performing OMB Revised Circular A–123 assessments and Medicare and Medicaid/SCHIP audit experience" (225 possible points); (2) understanding of the intent of the SOW, as manifested in a narrative of the offeror's planned approach to the task (75 points); (3) "key personnel," including a staffing plan, resumes, and a targeted training plan (50 points); and (4) a "work breakdown structure," illustrating the sequence of actions necessary to accomplish the task (50 points). AR 4–158 to 4–160 (Amendment # 2 to RFQ). The RFQ listed subfactors for each technical evaluation criterion, including the following subfactors under experience and past performance:

The firm must be an independent certified public accounting firm with direct knowledge and experience in performing OMB Revised Circular A–123 Appendix A Assessments and knowledge of [f]ederal financial accounting and reporting. Primary consideration will be given to firms that demonstrate experience performing similar work at CMS, other HHS OPDIVS [Health and Human Services Operating Divisions], or [f]ederal [g]overnment agencies similar in size, scope, magnitude, and complexity as CMS.

The firm must have demonstrated knowledge and experience in auditing Medicare and Medicaid/SCHIP operations, including Medicare contractors, data centers, and Medicare Advantage and Medicare Prescription Drug Programs. Offerors are to demonstrate knowledge of Medicare Part A (Hospital Insurance), Part B (Supplementary Medical Insurance), Part C (Medicare Advantage), and Part D (Prescription Drug) claims processing and pay-

---

6. The RFQ was provided to large businesses by CMS because FAR § 8.405–2(c)(4) requires that "[t]he ordering activity shall provide the RFQ . . . to any schedule contractor who requests a copy of it." *See* AR 20–1204 (Contracting Officer's Statement (Apr. 16, 2008)).

7. Three amendments to the RFQ were issued. The first amendment contained several sections of the Task Order which had been erroneously excluded from the original RFQ. *See* AR 2–53 to 2–104 (Amendment # 1 to RFQ (Dec. 18, 2007)).

The second amendment included Sections L and M of the RFQ, responses to offerors' questions, and a revised copy of the Statement of Work ("SOW"). *See* AR 4–109 to AR 4–207 (Amendment # 2 to RFQ (Jan. 8, 2008)). The RFQ was amended a third time to make certain revisions to the SOW and to extend the deadline for proposals from January 23, 2008 to January 28, 2008. *See* AR 6–211 to 6–213 (Amendment # 3 to RFQ (Jan. 16, 2008)).

ment methodologies, as well as [f]ederal financial accounting and reporting. AR 4–158 (Amendment # 2 to RFQ) (emphasis omitted).

CMS engaged in a more subjective assessment of other aspects of the offerors' proposals. It required offerors to submit a business proposal, which would be evaluated with respect to the "[o]fferor's financial capability [and] [c]onflict of [i]nterest certificates;" CMS would also make a responsibility determination based upon each offeror's business proposal. AR 4–157 (Amendment # 2 to RFQ). In addition, in the second amendment to the RFQ, CMS stated that it was requiring offerors to submit "a cost or price proposal supported by cost and pricing data adequate to establish *the reasonableness and realism of the proposed cost or price.*" AR 4–155 (Amendment # 2 to RFQ) (emphasis added). CMS asked the offerors to include in their business proposals "all costs *by task (including a breakdown of cost for each Medicare contractor, Data Center, and Regional Office listed in the attachments)* for ... Labor[,] ... Subcontracts[,] ... Other Direct Costs[,] ... G & A/Indirect Costs[,] ... and Fee/Profit." AR 4–155 to 4–156 (Amendment # 2 to RFQ).[8] Separately, CMS required offerors to submit responses detailing their record of past performance. AR 4–156 (Amendment # 2 to RFQ). These responses would be evaluated in accord with the requirements of FAR §§ 9.104–1, 9.104–3(b), and 42.15, to ensure that the offeror had a "satisfactory performance record." *Id.*

On January 28, 2008, proposals were submitted to CMS by Holloway, Grant Thornton, PriceWaterhouseCoopers, Mayer Hoffman McCann, and Reznick Group. *See* AR 16–1171 (Source Selection Document). The Technical Evaluation Panel evaluated these offerors' technical proposals in accordance with the RFQ and determined that three

offerors had achieved overall technical scores of either excellent or very good: PriceWaterhouseCoopers ( [* * *] points), Holloway ( [* * *] points), and Grant Thornton ( [* * *] points). *Id.*[9]

The Technical Evaluation Panel also performed what it termed a cost-realism analysis of the business proposals put forward by offerors. *See* AR 16–1172 (Source Selection Document). In evaluating the business proposals, the Panel compared each offeror's proposed labor hours and costs to an Independent Government Cost Estimate. *See id.* Upon meeting with the Technical Evaluation Panel to discuss preliminary results, the contracting officer, Mark W. Werder, noted that the Panel's comparison of prices to the Independent Government Cost Estimate "did not consider cost or price efficiencies within an offeror's approach using innovative or unique business processes." AR 20–1207 (Contracting Officer Statement (Apr. 16, 2008)). Mr. Werder instructed the Panel, in finishing its report, to take account of any such efficiencies and furthermore to recalculate travel costs based on more realistic estimates than those contained within the Independent Government Cost Estimate. *Id.*

The Technical Evaluation Panel ultimately recommended to the Contracting Officer that CMS consider awarding the A–123 contract to PriceWaterhouseCoopers, given its [* * *]. AR 15–1150 (Technical Evaluation Report). The Panel justified its recommendation of award to PriceWaterhouseCoopers by noting that this vendor, based on its past experience as an auditor with CMS, had "appropriate personnel with significant knowledge, skills, and expertise to provide the requirements outlined in the SOW ... and can directly assist in the remediation of the Medicare Claims Processing Controls['] material weakness." AR 15–1151 (Technical Evaluation Report).

8. Nonetheless the RFQ stated that offerors would not be required to submit current cost and pricing data for the project because "GSA had already determined the rates for services at hourly rates under [Federal Supply] [S]chedule contracts to be fair and reasonable." AR 17–1186 (Negotiation Memorandum).

9. An offeror who achieved a technical score of 320 points or higher was deemed to have an "excellent understanding of the tasks outlined in the Statement of Work" and a "solid ability to perform [that] work." AR 15–1150 (Technical Evaluation Report (Feb. 14, 2008)). An offeror with a score of 241 points or higher was deemed to have a "very good" understanding. *See* AR 15–1153 (Technical Evaluation Report).

After receiving and evaluating the panel's final report, Mr. Werder issued the Source Selection Document on February 21, 2008. AR 16–1166 to 16–1180 (Source Selection Document). In that document, Mr. Werder stated that under the RFQ the government was entitled to award the contract "to other than the lowest price offer or other than the highest technically rated offeror." AR 16–1172 (Source Selection Document). Mr. Werder took specific note of the fact that both PriceWaterhouseCoopers and Holloway had submitted proposed prices that were [* * *] greater than the funding that the government had budgeted for this contract. AR 16–1180 (Source Selection Document). He noted that PriceWaterhouseCoopers' proposal was [* * *], and that Holloway's proposal was [* * *]. *See* AR 16–1173 (Source Selection Document). Accordingly, in making the trade-off between technical score and cost, Mr. Werder concluded that an

> award to Grant Thornton [was] the best value for the government. Although PriceWaterhouseCoopers is the [* * *], the [g]overnment cannot justify paying [* * *] for [* * *] technical benefit. Similarly, the [g]overnment cannot justify paying [* * *] for [* * *] technical benefit between Holloway and Grant Thornton.

AR 16–1180 (Source Selection Document).

In reaching this award decision, Mr. Werder stated that his office had taken into consideration the concerns raised by the Technical Evaluation Panel regarding Grant Thornton's possible understatement of cost and hours. *See* AR 16–1176, 1180 (Source Selection Document). These concerns, Mr. Werder argued,

> were more than offset by the following: Grant Thornton is a large business with satellite offices throughout the United States. Grant Thornton is leveraging their use of an automated tool [* * *] to reduce direct travel costs as well as account for a[* * *] reduction in the level of effort (hours lost during downtime due to travel). A thorough evaluation of Grant Thornton's past performance and reference checks on A–123 assessments at other federal agencies supported their business proposal pricing consistent with past contract

awards. Grant Thornton displays the most advantageous balance between technical/management features and cost to the government and therefore is recommended for award.

AR 16–1180 (Source Selection Document). On February 21, 2008, following Mr. Werder's independent determination, Grant Thornton was notified that it had been awarded the A–123 contract. AR 20–1209 (Contracting Officer's Statement (Apr. 16, 2008)). Unsuccessful offerors, including Holloway and PriceWaterhouseCoopers, were notified the next day, February 22, 2008. *Id.*

**B. Holloway's Initial Protest Before GAO, CMS's Reaffirmance on Reconsideration, and Dismissal of Holloway's Further Protest by GAO**

Holloway lodged its first protest with GAO on March 10, 2008. AR 18–1188 to AR 18–1193 (Holloway Protest Letters, Mar. 10, 2008 & Mar. 18, 2008). Because Holloway's protest letters were received by CMS *after* February 25, 2008, the date that Grant Thornton's contract became effective, CMS notified Grant Thornton that a stay of performance would not be issued. AR 19–1195 (Notice of Protest of Award to Grant Thornton (Mar. 19, 2008)). Rather, Grant Thornton was asked to continue its work on the contract during the course of the protest before GAO. *Id.*

During proceedings on the protest, CMS voluntarily agreed to take corrective action and reconsider its source selection decision, and GAO consequently dismissed Holloway's protest. *See* AR 28–1253 (Second Addendum to Contracting Officer's Statement (Sept. 15, 2008)); AR 33–1276 (Holloway's Notice of Protest (Aug. 15, 2008)). Thereafter, Mr. Werder, the contracting officer, met with the Technical Evaluation Panel to determine whether the risk posed by Grant Thornton's low price should lead to a different source selection decision. AR 28–1253 to 28–1254 (Second Addendum to Contracting Officer's Statement). The Panel noted that its "earlier analysis of the business proposals was thorough" and "question[ed] whether this exercise [of reevaluating the proposals] will provide any value." AR 28–1253 (Second

Addendum to Contracting Officer's Statement). In response to these comments, CMS decided to allow the Panel's original analysis to stand as the official record, permitting Mr. Werder to weigh the risk to the A–123 program based on the Panel's original record. *Id.*

In statements submitted during the reconsideration process, Mr. Werder described the reasoning behind his earlier decision that Grant Thornton's proposed $2.4 million price for the nine-month base year was reasonable under FAR § 8.405–2(d). *See* AR 20–1202 to 20–1209 (Contracting Officer's Statement); AR 23–1227 to 23–1232 (Addendum to Contracting Officer's Statement (May 22, 2008)). Mr. Werder focused on deficiencies in the Technical Evaluation Panel's evaluation. *See, e.g.,* AR 23–1228 to 23–1229 (Addendum to Contracting Officer's Statement). He concluded that the Independent Government Cost Estimate used by the Panel for comparative purposes "was based on previously negotiated costs/prices for similar type effort (projected for the current period) and did not account for process improvements, business efficiencies and or risk approaches specific to any given A–123 offeror." AR 20–1204 (Contracting Officer's Statement). Mr. Werder also found that the Panel "used one travel estimate for the entire universe of sites without consideration for the location of the offerors which may have resulted in travel related efficiencies." *Id.*

In addition, upon request, the Technical Evaluation Panel offered comments on Grant Thornton's first five months of performance under the contract:

G[rant] T[hornton] has presented CMS with a high level of communication, cooperation, and professionalism that has contributed to satisfactorily meeting the deliverables to date, although several iterations of the deliverables were sometimes necessary before finals were approved by CMS. This may be attributed to the learning curve needed to fully understand CMS'[s] complex control environment and to the state-

ment of work not being fully explicit with regard to the requirements.

Overall, G[rant] T[hornton] has demonstrated that they can succeed on this project. G[rant] T[hornton] has satisfactorily met the deliverables to date and we believe they will continue to do so through the remainder of the contract period.

AR 25–1234 (Grant Thornton, LLP Current Performance under Contract No. GS–23F–8196H (July 29, 2008)).

Mr. Werder then performed an independent reevaluation of the award, giving attention to the risk engendered by Grant Thornton's lower pricing of its proposal. AR 28–1253 (Second Addendum to Contracting Officer's Statement). Mr. Werder concluded that the risk associated with Grant Thornton's proposal was minimal because any cost overruns would be "borne entirely by the contractor" and that the only potential negative consequence for the government would be the contractor's "inability to meet delivery timelines and quality standards." AR 28–1253 to 28–1254 (Addendum to the Contracting Officer's Statement). Accordingly, on July 30, 2008, Mr. Werder reaffirmed the earlier determination to award the contract to Grant Thornton. AR 26–1235 to 26–1238 (Addendum to Source Selection Document (July 30, 2008)). Notice of the decision to award the contract to Grant Thornton was sent to unsuccessful offerors on August 11, 2008. AR 27–1239 to 27–1252 (Notice of Award (Aug. 11, 2008)).

On August 15, 2008, Holloway lodged a second protest with GAO. AR 33–1275 (Holloway's Notice of Protest). This protest was dismissed by GAO on the ground that Holloway had failed to file its comments on the agency's report in a timely manner. AR 36–1289 (GAO Decision (Oct. 1, 2008)).[10] Holloway then filed a motion for reconsideration of the dismissal, which was denied by GAO on December 18, 2008, again on grounds of lack of timeliness. AR 37–1291 to 37–1292 (GAO Decision (Dec. 18, 2008)).

---

10. Materials contained after tab 33 were not part of the initial administrative record filed with the court. Both Holloway and the government have sought to supplement the administrative record with the materials from the litigation before the GAO, and the resulting issue of supplementation is addressed *infra.*

### C. Proceedings in this Court

On January 27, 2009, Holloway filed a post-award bid protest in this court, seeking declaratory and permanent injunctive relief. Holloway first alleges that the award of the A–123 contract to Grant Thornton lacked a rational basis and thus was arbitrary and capricious. Compl. ¶¶ 22–33. In a second count, Holloway alleges that the contracting officer acted with substantive bad faith and bias. Compl. ¶¶ 34–45. Finally, Holloway alleges prejudicial error, arguing that it stood a significant chance of receiving the contract award if its proposal had been "fairly and appropriately evaluated." Compl. ¶¶ 46–51. In accord with 28 U.S.C. § 1491(b)(3) and RCFC 52.1, this court adopted an expedited schedule for filing the administrative record of the procurement and cross-motions for judgment on that record. The administrative record was filed on February 6, 2009. In its motion for judgment on the administrative record, filed February 27, 2009, Holloway developed the averments set forth in its complaint. Br. in Supp. of Pl.'s Mot. for Judgment on the Administrative Record at 10–25 ("Pl.'s Mot."). In its cross-motion for judgment on the administrative record, filed March 17, 2009, the government argued that the administrative record established that CMS's award decision was rational. See Def.'s Cross–Mot. for Judgment upon the Administrative Record and Opp'n to Pl.'s Mot. for Judgment upon the Administrative Record at 18 ("Def.'s Cross–Mot."). Intervenor similarly filed a cross-motion to uphold CMS's award. Intervenor–Def.'s Cross–Mot. for Judgment on the Administrative Record and Resp. to Pl.'s Mot. A hearing was held on April 14, 2009, to address these cross-motions.

### STANDARDS FOR DECISION

 This court adheres to the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, when deciding a bid protest. See 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). Under the APA, this court may set aside an agency decision such as a contract award if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This standard of review is "highly deferential" to the agency's procurement decision, *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed.Cir.2000), and entitles the agency's decision to a " 'presumption of regularity.' " *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085 (Fed.Cir.2001) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 103, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (abrogating the portion of *Overton Park* that recognized the APA as an independent grant of subject matter jurisdiction)). Accordingly, this court's task is to examine the administrative record of the procurement to determine whether the agency's decision is supported by that record. *See Bannum*, 404 F.3d at 1355–57.

 If the agency's action "evinc[es] rational reasoning and consideration of relevant factors," then this court will sustain the action. *Advanced Data Concepts*, 216 F.3d at 1058. The agency's decision will be upheld even if the court might have interpreted and applied the procurement regulations in a different fashion had the court been in the agency's position. *See Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed.Cir. 1989); *see also Lumetra v. United States*, 84 Fed.Cl. 542, 549 (2008) ("[T]he court will not second guess 'the minutiae of the procurement process in such matters as technical ratings and the timing of various steps in the procurement.' " (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir. 1996))). However, where the agency " 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' " then its decision will be set aside for lack of a rational basis. *Keeton Corrs., Inc. v. United States*, 59 Fed.Cl. 753, 755 (2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct.

2856, 77 L.Ed.2d 443 (1983)). Accordingly, this court's task is to determine whether the aggrieved offeror has established that "the procurement official's decision lacked a rational basis" or that "the procurement procedure involved a violation of regulation or procedure." *Centech Group, Inc. v. United States,* 554 F.3d 1029, 1037 (Fed.Cir.2009) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001)); *accord Lumetra,* 84 Fed.Cl. at 549.

## ANALYSIS

### A. Standing

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874–75 (Oct. 19, 1996) (codified at 28 U.S.C. § 1491(b)), grants this court "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).[11] The government does not explicitly challenge this court's jurisdiction, but implicitly raises a challenge to Holloway's standing as an "interested party" by noting the contracting officer's determination that Holloway's proposal contained an error regarding cost information. Def.'s Cross–Mot. at 19 (citing AR 20–1207 (Contracting Officer's Statement)).

 The determination of whether a bid protester has standing to sue is part of this court's threshold inquiry into jurisdiction. *See Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1307 (Fed.Cir.2006). Standing to bring a protest under the ADRA is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *American Fed'n of Gov't Employees v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001) (holding that the Tucker Act's use of the term "interested party" indicates that Congress desired to adopt the definition of that term set forth in the Competition in Contracting Act, 31 U.S.C. § 3551(2)). It is Holloway's burden, as plaintiff in this case, to establish by a preponderance of the evidence that it has standing to pursue its claims. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1370 (Fed.Cir.2002). To demonstrate that it was an "interested party" in the economic sense, Holloway must show that it would have a "greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest." *Information Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir. 2003); *Alabama Aircraft Indus., Inc. v. United States,* 83 Fed.Cl. 666, 681 (2008).

 Holloway was one of three offerors who were deemed to be technically qualified by the Technical Evaluation Panel. *See* AR 16–1171 (Source Selection Document) (noting that PriceWaterhouseCoopers, Holloway, and Grant Thornton had attained technical scores of either excellent or very good). CMS identified at least one error or notable concern respecting the proposals of each of these three offerors. Grant Thornton, for instance, was recognized by the Technical Evaluation Panel to have overstated Medicare contractor costs and understated the number of labor hours necessary to complete the entire A–123 assessment. AR 14–1143 (Business Proposal Evaluation). Holloway erred in its business proposal by failing to submit a quote for the costs it would incur in assessing one of the Medicare contractor sites it would be required to visit during its work under the

---

**11.** Jurisdiction over this bid protest exists under the Tucker Act as amended by the ADRA notwithstanding the provisions of 41 U.S.C. § 253j(e), which states that "[a] protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for—(A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued." *See IDEA Int'l, Inc. v. United States,* 74 Fed.Cl. 129, 135–36 (2006) (concluding that the statutory restrictions on protests set out in 10 U.S.C. § 2304c(d) and 41 U.S.C. § 253j(e), which are in like form, do not apply to task or delivery orders made under GSA's Federal Supply Schedule program).

contract. *See* AR 14–1149 (Business Proposal Evaluation). However, neither Holloway, Grant Thornton, nor PriceWaterhouseCoopers were disqualified from the competition on the basis of these errors or concerns and each of the three contractors was understood to be within the zone of competition for the A–123 contract.

Because Holloway can demonstrate that it was within the zone of competition for the contract and that the omission in its proposal was not disqualifying, it has shown that it would have a realistic chance of receiving the contract if successful on the merits of this bid protest. For this reason, Holloway is an interested party with standing to pursue its claim against CMS, and this court has jurisdiction to decide Holloway's bid protest under the ADRA.

### B. Supplementation of the Record

■ On February 28, 2009, plaintiff moved to supplement the administrative record, requesting the inclusion of six additional documents generated during the proceedings before GAO in this case: (1) Holloway's comments to GAO on the agency's report (May 2, 2008); (2) Holloway's response to the agency's supplemental memorandum of law (May 28, 2008); (3) GAO's decision dismissing Holloway's first protest (June 13, 2008); (4) GAO's acknowledgment of Holloway's protest (Aug. 21, 2008); (5) Holloway's correspondence with the contracting officer in connection with its entitlement to reasonable protest costs (Sept. 15, 2008); and (6) Holloway's comments to GAO regarding the agency's report (Sept. 25, 2008). Pl.'s Mot. to Supplement the Administrative Record at 1–2. The government opposes plaintiff's motion in part, arguing that the four documents regarding Holloway's comments and correspondence—Holloway's proffered exhibits (1), (2), (5), and (6)—"were never before the agency at any time prior to the final con-

tract award decision and did not play any role in the agency's decision-making process." *See* Def.'s Resp. to Pl.'s Mot. to Supplement the Administrative Record at 1. By contrast, the government agrees with the proposed inclusion of GAO's first decision and its acknowledgment of Holloway's protest, and additionally, albeit inconsistently, argues for the inclusion of GAO's decision dismissing Holloway's second protest (Oct. 1, 2008) and GAO's decision denying Holloway's request for reconsideration (Dec. 18, 2008). *Id.* at 1–2.

This court's rules provide a short and succinct ground for resolving this dispute over the content of the administrative record. RCFC Appendix C, ¶ 22, specifies that "core documents relevant to a protest case may include, as appropriate," twenty-one categories of materials, the last of which is "the record of any previous administrative or judicial proceedings relating to the procurement, including the record of any other protest of the procurement." *Id.* ¶ 22(u). Each of the documents proffered by Holloway relates to the protests before GAO and falls into this category. By rule, the record therefore should include these materials.

■ In effect, the government's position implicitly challenges the validity of RCFC Appendix C, ¶ 22(u). As a general matter, the Federal Circuit has recently emphasized that this court's review of bid protests should proceed on the basis of the materials before the agency at the time of the procurement decision and that "supplementation of the [resulting] record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.' " *Axiom Res. Mgmt., Inc. v. United States,* 564 F.3d 1374, 1380 (Fed.Cir.2009) (quoting *Murakami v. United States,* 46 Fed.Cl. 731, 735 (2000), *aff'd,* 398 F.3d 1342 (Fed.Cir.2005)).[12]

---

12. In a protest before the court, factual matters respecting relief rest on a separate and distinct footing. "It is the responsibility of this [c]ourt, not the administrative agency [conducting the procurement], to provide for factual proceedings directed toward, and to find facts relevant to, irreparability of harms or prejudice to any party or to the public interest through grant or denial of injunctive [or declaratory] relief." *PGBA, LLC v. United States,* 60 Fed.Cl. 567, 568 n. 1 (2004),

*aff'd,* 389 F.3d 1219 (Fed.Cir.2004). *See also Bannum,* 404 F.3d at 1354 ("28 U.S.C. § 1491(b)(4) applies to the Court of Federal Claims's review of agency findings, not the trial court's initial fact-finding.... [The] 'arbitrary and capricious' review ... standard goes to the agency's compliance with the law, whereas the prejudice determination assesses whether an adjudged violation of law warrants setting aside a contract award."); RCFC 52.1 Rules Committee

Because *post-award* protests before GAO that occur prior to protest proceedings in this court necessarily will involve materials that were not before the agency at the time of award, the provisions of RCFC Appendix C, ¶ 22(u) might be viewed as being inconsistent with the record-review task with which this court is charged by the Tucker Act as amended by the ADRA. In protests, GAO receives the administrative record of the procurement, but it also typically receives extra-record argumentative and evidentiary submissions from both the agency and the protestor. For example, the procuring agency's selection authority files statements in the GAO protest proceedings that may well include explanations and information beyond that contained in the procurement record, as happened here, and GAO may also hold hearings and receive testimony by the procuring official. *See, e.g., PGBA,* 60 Fed.Cl. at 211–13, 219 (describing and addressing testimony given by a selection authority in a GAO protest hearing). The subsequent testimony may involve a "clarification" that actually serves as a post-hoc rationalization of the action previously taken, or, indeed, it may constitute a new position. Correspondingly, a protestor may also use a GAO protest to adduce evidentiary materials that perhaps should have been, but were not, presented to the agency before it reached a decision on an award. A receiving court must be wary of such situations, but that skeptical role is not unusual for a court. On the other hand, the GAO record may provide a framework for an agency's actions, as, for example, here, where CMS voluntarily undertook to reconsider its position during the course of the first GAO protest, and it is the reconsidered action that is before the court for review. RCFC Appendix C, ¶ 22(u) consequently serves the salutary purpose of ensuring that the full record of all proceedings related to the procurement is before the court for review, even if parts of the record may be of limited utility. On numerous occasions, parties file protests with this court after having failed to obtain relief before GAO, and paragraph

22(u) of RCFC Appendix C ensures that GAO and the court are reaching decisions on protests based upon the same materials. It would be strange for this court to be addressing a protest on a more truncated record than that which had been before GAO.

In short, RCFC Appendix C, ¶ 22(u) is valid, the documents proffered by Holloway from the GAO protests should be added to the record, and Holloway's motion accordingly will be granted.

### C. Consideration of Price in the Best–Value Determination

Holloway offers several grounds for its contention that CMS's decision to award the A–123 contract to Grant Thornton lacks a rational basis. The first set of arguments turns on Holloway's contention that the contracting officer failed to adhere to various requirements regarding cost-realism analysis under FAR Part 15. *See* Pl.'s Mot. at 18–21. A second, related set of Holloway's contentions concern the reasonableness of the contracting officer's decision to override the Technical Evaluation Panel's concerns as to Grant Thornton's ability to perform the A–123 contract. *See id.* at 10–17.

### 1. Analysis of cost.

 The Technical Evaluation Panel used cost-realism analysis in assessing the offerors' proposals while the contracting officer opted instead to perform a reasonableness assessment under FAR Subpart 8.4 to determine which offerors' proposal represented the "best value" to the government. *Compare* AR 14–1141 (Business Proposal Evaluation), *with* AR 25–1237 (Addendum to Source Selection Document). The parties have carried that difference over into their arguments in this case.

Holloway seeks to apply procedures from FAR Part 15—procedures similar to the cost-realism analysis mentioned by the Technical Evaluation Panel—to this procurement. *See* Pl.'s Mot. at 21. Cost-realism analysis "is a well-established analytical tool in gov-

Note for 2006 Adoption ("Cases filed in this court frequently turn only in part on action taken by an administrative agency. In such cases, the administrative record may provide a factual and procedural predicate for a portion of the court's decision, while other elements may be derived from a trial [or] ... an evidentiary hearing.").

ernment contracting, primarily designed to weed out offers that reflect an unrealistically low price and thus put performance at risk." *Alabama Aircraft*, 83 Fed.Cl. at 696 (citing Ralph C. Nash & John Cibinic, *Price Realism Analysis: A Tricky Issue*, 12 No. 7 Nash & Cibinic Rep. ¶ 40 (1998)). Under cost-realism analysis, the agency

> independently review[s] and evaluat[es] specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

FAR § 15.404–1(d)(1). The reason to guard against unrealistically low pricing is to ensure that the contract is not awarded to an offeror who "does not understand the work to be done" or who "intentionally offered a low price to win the competition (the so-called 'buy-in')." 12 No. 7 Nash & Cibinic Rep. at 108. Cost-realism analysis thus seeks to prevent "acceptance of an unrealistically low price with a resulting lack of sufficient funds in the contract, [which] may pose a risk of poor performance or even a lack of capability to perform (nonresponsibility)." *Id.*

However, the government is not always obligated to perform a cost-realism analysis when analyzing competing proposals. Competitive procedures have been classified into specific subtypes, of which competitive proposals are one and FSS contracts are another. *See Systems Plus, Inc. v. United States*, 68 Fed.Cl. 206, 209 (2005). Applying that distinction, the court in *Systems Plus*

> f[ou]nd it persuasive that [FAR] subpart 8.404(a) explicitly exempts supply schedule procurements from [FAR] Parts 13 (with minor exceptions), 14, and 15.... Thus, while the agency can elect to use procedures from these other parts, they are not presumptively applicable.

*Id.* at 210. The distinction between when "the more formal and rigorous procedures for negotiated procurements set forth in FAR Part 15" are required, and when they

are not, has to do with the nature of the procurement. *See Labat–Anderson, Inc. v. United States*, 50 Fed.Cl. 99, 103 (2001). A procurement taking place under the FSS program involves the selection of "products and services from a list of eligible contractors whose pricing schemes have been pre-approved by GSA." *Id.* In this circumstance, because the GSA has already determined that the prices of supplies and services under FSS contracts are "fair and reasonable," the ordering agency is "not required to make a separate determination of fair and reasonable pricing, except for a price evaluation as required by [FAR § ] 8.405–2(d)." FAR § 8.404(d). In this context, FAR § 8.405–2(d) instructs that the contracting agency "is responsible for considering the level of effort and the mix of labor proposed to perform a specific task being ordered, and for determining that the total price is *reasonable.*" FAR § 8.405–2(d) (emphasis added).

In short, "a procurement under subpart 8.4 is different in kind from one conducted under Part 15, even if some procedures also present in Part 15 are u[s]ed." *Systems Plus*, 68 Fed.Cl. at 211; *see also Ellsworth Assocs., Inc. v. United States*, 45 Fed.Cl. 388, 395–96 (1999) (holding that "consistent with the simplified and flexible approach Part 8 takes toward [FSS] procurements, ... the protester will not be able to prevail on the theory that the procurement procedure involved a clear and prejudicial violation of applicable statutes and regulations, because no applicable procedural regulations are contained in [FAR] Part 8. A protester instead must rely on establishing that the government officials involved in the procurement process were without a rational and reasonable basis for their decision."). Accordingly, a cost-realism analysis that accords with FAR § 15.404–1(d)(1), quoted *supra*, is not necessarily required when reviewing offers made pursuant to a negotiated procurement under the GSA's FSS program. This contrasts with the source selection decisions reviewed by this court in *Lumetra* and *Alabama Aircraft*, neither of which involved an FSS procurement but both of which explicitly mandated that the agency "perform a cost-realism analysis." *Lumetra*, 84 Fed.Cl. at 560 (citing Sections L

and M of the Request for Proposals); *see also Alabama Aircraft*, 83 Fed.Cl. at 671 ("Although the ... contract was to be a fixed-price contract, the RFP explicitly required the Air Force to evaluate the 'reasonableness and realism of the prices and labor rates proposed' by the offerors." (quoting the Solicitation–Request for Proposal)). Here, no such mandate was included in the RFQ.

Holloway argues that "[FAR] 8.4 does not prohibit cost realism assessment, which we believe was required under this RFQ, and which was in fact conducted by the [P]anel [and] which the Source Selection Authority confirmed in the source selection document." *See* Hr'g Tr. 34:10–14 (Apr. 14, 2009). Holloway additionally points to CMS's second amendment to the RFQ, in which CMS asked offerors to submit "a cost or price proposal supported by cost and pricing data adequate to establish *the reasonableness and realism of the proposed cost or price*," AR 4–155 (Amendment # 2 to RFQ) (emphasis added), as calling for a cost-realism analysis by the contracting officer. *See* Hr'g Tr. 36:2–7.

The second amendment to the RFQ introduced an ambiguity which was not fully resolved by CMS during this procurement. However, because the RFQ expressly provided that the resulting award was to be a "[t]ask [o]rder" under a "current GSA Schedule contract," AR 1–1(RFQ), all offerors were on notice that the framework provided by FAR Subpart 8.4 applied. In the circumstances at hand, a cost-realism analysis would be required only if CMS had specifically set out such a requirement. Moreover, the conduct of CMS does not lend support to the existence of a price-realism mandate. Although the Technical Evaluation Panel at times used cost-realism language, it frequently also referred to the "reasonableness" of the price proposed by various offerors. *See, e.g.*, AR 14–1141 to 14–1144 (Business Proposal Evaluation). In this respect, the contracting officer opined that "[t]he main concern of the TEP was whether or not Grant Thornton's proposed price was *reasonable* based on the [Independent Government Cost Estimate]." AR 26–1237 (Addendum to Source Selection Document) (emphasis added). The contracting officer restricted himself to a cost-reasonableness analysis, omitting any mention of cost-realism.

Overall, CMS's contracting officer was not obligated by the RFQ to employ the detailed cost-realism procedures set out in FAR Part 15. It was sufficient, under FAR Subpart 8.4, for the contracting officer to have conducted, in conjunction with a performance risk assessment, a "best value" inquiry into the reasonableness of the competing proposals.

### 2. *Reasonableness of CMS's assessment.*

 As to the second set of Holloway's contentions, *viz.*, that the contracting officer was unreasonable in rejecting the Technical Evaluation Panel's concerns regarding Grant Thornton's proposal, this court reviews the record to determine whether CMS's contracting officer articulated a rational basis for his decision and gave sufficient consideration to relevant factors. *Emery Worldwide Airlines*, 264 F.3d at 1085.

Holloway first claims that the contracting officer ignored the Technical Evaluation Panel's concerns as to Grant Thornton's ability to perform the A–123 contract. Specifically, Holloway objects to the "conspicuous[ ] absen[ce]" from the source selection document of the Panel's statement " 'that Grant [Thornton] does not have a thorough understanding of the task as described in the [Statement of Work].' " Pl.'s Mot. at 11 (quoting AR 14–1141 (Business Proposal Evaluation)). Holloway avers that the contracting officer awarded the contract to Grant Thornton while "[d]ismissing or totally disregarding the [Panel's] assessment" of Grant Thornton's inadequate allotment of labor hours and resources. *Id.*

In a related argument, Holloway casts doubt on the contracting officer's consideration of the travel-based efficiencies engendered by Grant Thornton's use of the [* * *] tracking system, arguing that the existence of these efficiencies "is not supported by the content of Grant Thornton's technical or business proposals." Pl.'s Mot. at 15. Holloway contends that the contracting officer's reliance on these alleged efficiencies indicates that his decision to award the contract

"was based on irrational assumptions and calculations." *Id.* at 14.

Holloway's contentions require a careful review of the record to determine whether the contracting officer took account of the concerns expressed by the Technical Evaluation Panel and balanced those concerns with the strengths and weaknesses observed in a performance risk assessment.

### a. *CMS's price-reasonableness assessment.*

Both the Technical Evaluation Panel and the contracting officer assessed the risks in the offerors' proposals, finding a variety of strengths and weaknesses in each proposal. For example, in its evaluation of Grant Thornton's proposal, the Panel expressed concern regarding the breadth of Grant Thornton's audit experience as well as the gap between the firm's proposed labor costs and an Independent Government Cost Estimate of those costs, but also noted a strength in Grant Thornton's use of the [* * *] Internal Controls Tool "as a solution to upload internal controls 'forms and templates,'" which would "provide the capability for CMS to access real time information on fieldwork." AR 15–1161 to 15–1163 (Technical Evaluation Report). In his best-value determination, and in his reaffirmation of that determination, the contracting officer recognized that "[t]he main concern of the [Panel] was whether or not Grant Thornton's proposed price was reasonable based on the I[ndependent] G[overnment] C[ost] E[stimate]." AR 26–1237 (Addendum to Source Selection Document). In light of this concern, Mr. Werder conducted a detailed analysis of the offerors' proposed travel costs, and compared their average proposed price per trip for the various CMS sites to both the market prices for such trips and to the Independent Government Cost Estimate. AR 28–1254 (Second Addendum to Contracting Officer's Statement).

It was rational for Mr. Werder to address the government's cost estimate as well as the offerors' market prices in his price-reasonableness assessment, given his earlier conclusion that the Independent Government Cost Estimate "did not break out prices for each site[,] ... did not account for process improvements, business efficiencies, and or risk approaches specific to any given A–123 offeror[,] ... [and] used one travel estimate for the entire universe of sites without consideration for the location of the offerors which may have resulted in travel related efficiencies." AR 20–1204 (Contracting Officer Statement). Mr. Werder's critique of the Independent Government Cost Estimate and the use of an alternative method to determine the reasonableness of the offerors' proposed pricing schemes has support in the record. Specifically, Mr. Werder justifiably rejected the Panel's reliance on the Independent Government Cost Estimate on the grounds that it "failed to account for Grant Thornton's innovative approach using the automated [* * *] tool that reduced direct travel expenditures, as well as account[ed] for a 20% reduction in the level of effort." AR 26–1237 (Addendum to Source Selection Document). In addition, contrary to Holloway's contention that the benefits of the [* * *] tool were based on irrational calculations, this court finds that Mr. Werder made a reasoned analysis in determining the benefits of the [* * *] program and applying them to Grant Thornton's proposal. Mr. Werder noted that the [* * *] tool would enable Grant Thornton to "review work papers remotely," thus curtailing some trips to remote locations and "reducing the cost of travel." AR 26–1237 (Addendum to Source Selection Document). He also had a basis for including that other savings would accrue from the program's documentation and workload-distribution features. *Id.*

■ Holloway's contention that the contracting officer offered factors and an explanation for its award that were inconsistent with the evidence underlying the price-realism analysis conducted by the Technical Evaluation Panel, *see* Pl.'s Mot. at 17, is similarly unavailing. The contracting officer's decision to question certain of the Panel's findings and to supplement the factors considered during the Panel's analysis falls well within a procurement official's "substantial discretion to determine which proposal represents the best value for the [g]overnment." *E.W. Bliss Co.,* 77 F.3d at 449.

Nor is there merit to Holloway's argument that CMS broke with the evaluation terms

set forth in the RFQ by "disregard[ing] the fact that none of the federal agencies for which Grant Thornton based its prior experience was similar in size, scope, magnitude or complexity to CMS." Pl.'s Mot. at 13. The RFQ indicates that "[p]rimary consideration will be given to firms that demonstrate experience performing similar work at CMS . . . or [f]ederal [g]overnment agencies similar in size, scope, magnitude, and complexity as CMS." AR 4–158 (Amendment # 2 to RFQ). However, this criterion for evaluating past performance does not disqualify an offeror merely on the basis that it had not previously worked with federal agencies that were as large as CMS. Accordingly, Holloway cannot demonstrate that the contracting officer's price-reasonableness assessment was based on irrational considerations.

*b. CMS's performance risk assessment.*

██ CMS's assessment of the performance risks in the offerors' proposals was detailed. In independently reevaluating the initial award decision, Mr. Werder attended to the risks engendered by the relatively low price on Grant Thornton's proposal—risks which were present even after the above [* * *]—based efficiencies were factored into the analysis. *See* AR 28–1253 (Second Addendum to Contracting Officer's Statement). He evaluated Grant Thornton's ability to meet delivery timeliness, AR 28–1253 to 28–1254 (Second Addendum to Contracting Officer's Statement), and, on reconsideration, took account of the fact that Grant Thornton's first five months of performance had been satisfactory. AR 28–1254 (Second Addendum to Contracting Officer's Statement). Overall, Mr. Werder concluded that the risk of untimely or botched performance was minimal because Grant Thornton itself would be required to bear the risks of any cost overruns. AR 28–1253 to 28–1254 (Second Addendum to Contracting Officer's Statement). The court is unable to find any steps within this decision-making process that could properly be characterized as arbitrary, capricious, or irrational.

Finally, Holloway contends that CMS was wrong to conclude, on the basis of an interim assessment of Grant Thornton's performance, that "the risk identified by the T[echni-

cal] E[valuation] P[anel] had not materialized." Pl.'s Mot. at 16. Holloway claims that Mr. Werder's performance assessment did not in fact allay the Panel's earlier concern that Grant Thornton lacked a thorough understanding of the task described in the RFQ. *Id.* Holloway instead argues that it "corroborate[d] the legitimacy" of concerns regarding Grant Thornton's understanding of the tasks it had to perform and "the complexity of CMS' control environment." Pl.'s Resp. to Def.'s Cross–Mot. at 12–13.

In this interim assessment, CMS noted that Grant Thornton "has satisfactorily met the deliverables to date and we believe they will continue to do so through the remainder of the contract period." AR 25–1234 (Grant Thornton, LLP Current Performance under Contract No. GS–23F–8196H). This performance assessment factored into Mr. Werder's reconsideration, but it was not the primary reason behind CMS's decision to reaffirm the award to Grant Thornton. Nonetheless, tellingly, the assessment does not indicate that Grant Thornton was struggling or failing to perform under the contract with CMS. Instead, the assessment was a measured but generally positive evaluation of Grant Thornton's performance, and thus was an indication that "the inherent risk of Grant Thornton not being able to perform the requested task(s) at the price quoted has not borne out." AR 26–1236 (Addendum to Source Selection Document).

██ Overall, in awarding the contract to Grant Thornton and in justifying that award decision as presenting the best value to the government, CMS offered a " 'coherent and reasonable explanation of its exercise of discretion.' " *Centech Group,* 554 F.3d at 1037 (quoting *Impresa Construzioni,* 238 F.3d at 1332–33). CMS, through its contracting officer, made a reasoned determination that the price offered by Grant Thornton was reasonable and that any performance risks associated with Grant Thornton's proposal were acceptable. Given that the procurement authority is " 'entitled to exercise discretion upon a broad range of issues confronting them in the procurement process,' " *Impresa Construzioni,* 238 F.3d at 1332 (quoting *Latecoere Int'l, Inc. v. United States Dep't of*

*the Navy,* 19 F.3d 1342, 1356 (11th Cir. 1994)), this court finds that Mr. Werder acted reasonably in conducting this assessment.[13]

### D. *Bias*

Finally, Holloway argues that "[t]he S[ource] S[election] A[uthority]'s willful disregard of the regulations and evidence before him and CMS support[s] a finding of bad faith and bias." Pl.'s Mot. at 22. However, Holloway's contentions of bad faith mainly stem from events associated with a different solicitation, in which allegedly "Mr. Werder verbally tried to intimidate [Holloway] to withdraw its submission where it was the lowest bidder." *See* AR 23–1227 (Addendum to Contracting Officer's Statement). Mr. Werder responded to this allegation by explaining that in the different solicitation, he had contacted Holloway to insure that they had not made a mistake in their offered price and, upon receiving assurance that the price was correct, had made the award to Holloway as priced. AR 23–1228 (Addendum to Contracting Officer's Statement). Accordingly, this allegation by Holloway is not supported, and there assuredly is no evidence of any " 'specific intent [on the part of the agency] to injure the plaintiff.' " *Galen Med. Assocs. v. United States,* 369 F.3d 1324, 1330 (Fed.Cir.2004) (quoting *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 770 (1982)). Holloway has not overcome the "strong presumption" that contracting officials such as Mr. Werder are acting in good faith when carrying out their duties. *Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1239 (Fed.Cir.2002).

### CONCLUSION

For the reasons stated above, Holloway's motion for judgment on the administrative record is DENIED. The government's and intervening defendant's cross-motions for judgment on the administrative record are GRANTED. The clerk shall enter judgment

for the government and intervening defendant in accord with this decision. No costs.[14]

The parties are requested to review this decision and to file proposed redactions on or before May 13, 2009.

It is so ORDERED.

---

13. Other alleged errors pertaining to the contracting officer's failure to adhere to requirements under FAR Part 15 are not pertinent to this court's review.

14. For good cause shown, Holloway's motion for supplementation of the administrative record is GRANTED.